**Abbas ZAHEDI, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 98–71179.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2000

Filed Sept. 6, 2000

---

Nicholas Marchi (argued) & Michele Carney, Carney & Marchi, P.S., Seattle, Washington, for the petitioner.

Susan Houser (argued) & Carl H. McIntyre, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: FLETCHER, HALL, and TASHIMA, Circuit Judges.

FLETCHER, Circuit Judge:

Abbas Zahedi, a citizen of Iran, petitions for review of the determination of the Board of Immigration Appeals ("BIA" or "Board") that he has not established asylum eligibility. Zahedi was involved in an endeavor with one other person to translate and informally distribute a Farsi edition of Salman Rushdie's banned novel *The Satanic Verses*. His partner in the project was arrested and apparently tortured by the Iranian authorities; death ensued. The Immigration Judge ("IJ") found Zahedi's testimony not credible, and the BIA adopted the IJ's decision. Zahedi appealed to this court, arguing that the IJ's credibility finding was in error and contrary to this court's standards guiding such findings. He asserted that he had made out a sufficient claim of asylum eligibility, and argued that he was also entitled to withholding of deportation. Because the evidence would compel any reasonable fact-finder to reach a conclusion contrary to that of the BIA, we grant the petition and find Zahedi eligible for asylum and entitled to withholding of deportation.

1. See Pub.L. No. 104–208 (Division C), 110 Stat. 3009–546. IIRIRA repealed section 106(a) of the INA, and replaced it with a new judicial review provision at section 242 of the INA.

2. See IIRIRA §§ 309(c)(1) and (4), 110 Stat. 3009–625–26.

## I.

The INS issued an Order to Show Cause on June 16, 1996, charging Zahedi with deportability under former INA § 241(a)(1)(B), 8 U.S.C. § 1251(a)(1)(B), for entering the country without inspection. The IJ rejected Zahedi's asylum claim in a decision dated May 1, 1997. The BIA entered its final order affirming the order of deportation on September 16, 1998. Zahedi timely filed his petition for review with this court on October 13, 1998.

This court has jurisdiction pursuant to section 106(a) of the INA, 8 U.S.C. § 1105a(a), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").[1] This case falls within IIRIRA's "transitional rules," which apply to deportation proceedings that were commenced before April 1, 1997 and resulted in final deportation orders issued after October 30, 1996. The transitional rules provide that, with certain exceptions not relevant here, the court of appeals has jurisdiction under old section 106(a) of the INA.[2]

### A. Factual Background

Before he came to the United States, Abbas Zahedi was an independent business owner, operating an automobile parts store and an electronics store in Teheran, Iran. In 1994 or 1995, Zahedi heard about the book *The Satanic Verses* by British author, Salman Rushdie. His interest was piqued by the furor within his country concerning the book and the *fatwa* issued by the late Ayatollah Ruhollah Khomeini condemning Rushdie to death.[3] Zahedi felt *The Satanic Verses* might have an important message for Iranians. At his

3. The *fatwa* called for the death of Rushdie and all those involved in the publishing or translation of *The Satanic Verses*, which was considered a direct attack on Islam. *See* Amnesty International, Iran: Serious Violations Continue Amid Political and Religious Repression 2 (1993) (included in Administrative Record).

asylum hearing, Zahedi explained his motivation this way:

> I thought maybe [government officials] are trying to hide something from people, from us. Therefore, I was determined to find this book, no matter how expensive or dangerous it is, and find out what it is about and let the people know. It was very important to me and I was very curious of that—the people ruling . . . my country who claim that they are . . . the freedom fighter[s], and at the same time they have determined . . . so many million dollars for the—to kill this writer . . . who we all know everybody has a right to write freely, and I was really curious to find out what this book is all about.

Zahedi set out to find the book during the winter of 1996; he located a copy "with a lot of difficulty" in Turkey, purchased it and brought it back to Iran. Knowing that "the punishment of having possession of this book is very heavy," Zahedi was circumspect in his planning. He contacted a friend who lived in his mother's neighborhood named Moshen; Moshen had been expelled from the university on the basis of his political beliefs. Zahedi presented his idea for a joint venture: Moshen would translate the book and Zahedi would distribute it. Moshen agreed; the two "swore that in case we were—any of us were captured" each man would not inform on the other.

Moshen began translating the book chapter by chapter. As soon as Moshen completed a Farsi version of a chapter, Zahedi duplicated the pages using a copy machine. Zahedi then distributed the chapters to individuals he knew who were critical of the government; they in turn gave copies away to others. Zahedi explained at his hearing that he chose recipients who he could trust, whose relatives had been targeted and killed by the government. Zahedi distributed multiple copies of four separate chapters to about twenty to twenty-five people each. Based on his estimates, Zahedi gave out at least fifty copies of each chapter.

Moshen and Zahedi did not get very far in their endeavor. The translation project was cut short when the security forces arrested Zahedi's colleague Moshen. Zahedi learned that Moshen had been arrested from his mother, who lives next door to Moshen's mother. Although Moshen and Zahedi had promised each other not to reveal the name of the other to the authorities, Zahedi was well aware that the authorities frequently tortured political suspects. Knowing the difficulty of keeping secrets under such abuse, Zahedi realized that he was in grave danger. As he explained at the asylum hearing, the "ultimate punishment is death" for anyone caught distributing *The Satanic Verses*. Zahedi immediately sought help to leave the country from a friend. The friend, a businessman with an import-export venture with ties to Canada, was able to obtain a Canadian visa for Zahedi. Zahedi left Teheran on April 14 and arrived in Canada on April 15, 1996.

Although the details of his death were not clear until later, Moshen died in detention.

On the same day he fled Teheran, the Iranian authorities attempted to serve a summons on Zahedi requiring his appearance in court. Finding that he was not home, the authorities returned repeatedly to serve summons at his mother's home. They also harassed and threatened Zahedi's mother, exhorting her to tell Zahedi that he should return home. The authorities harassed other members of his family also, even asking Zahedi's daughter if she knew where her father was. When Zahedi did not heed the summons, a notice was published in the official government paper stating that Zahedi must appear in court or face a default verdict. A letter marked "absolutely confidential" was written by the Bureau of Interrogation to the Islamic Revolutionary Court stating that Zahedi "has been active in reproduction and distribution of the misleading book of 'Satanic Verses'" and explaining that the

court should proceed with the case against him.[4]

### B. *The Immigration Judge's Decision*

The IJ found that Zahedi was not credible. She stated that Zahedi had been "evasive," found that he testified "generally," and concluded that he was "inconsistent." Based on this credibility determination, the judge also rejected the documentary evidence Zahedi offered, including copies of the summons requiring him to appear in court, the published notice concerning his case, the letter from the Bureau of Interrogation, and Moshen's death certificate. The IJ found that "respondent may face criminal charges when he returns to Iran," but stated that "[t]hat is a matter for the government of Iran to decide. This is not a basis for the grant of asylum." On appeal, the BIA adopted and affirmed the IJ's decision, dismissing the appeal. In his petition to this court, Zahedi urges us to find that the IJ erred in making its credibility finding, find him eligible for asylum and withholding of deportation, and reverse and remand for exercise of discretion.

### II.

The BIA and IJ's factual determinations are reviewed under the substantial evidence standard. *See INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We owe deference to legal decisions rendered by the BIA and IJ under the rubric of *Chevron v. N.R.D.C.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). We may reverse if the evidence is such that any reasonable factfinder would conclude that a well-founded fear of persecution has been established. *See Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812; *Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998). In cases like this, where the BIA did not review the case de novo, we review the decision of the

Immigration Judge. *See Lata v. INS,* 204 F.3d 1241, 1244 (9th Cir.2000).

### A. *General Standards for Asylum Eligibility*

To be eligible for asylum, an applicant must show that he is "unable or unwilling" to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). To establish a well-founded fear of persecution, Zahedi must show that his fear is both objectively reasonable and subjectively genuine. *See Fisher v. INS,* 79 F.3d 955, 960 (9th Cir.1996) (en banc). The objective component of this test requires showing "by credible, direct, and specific evidence in the record, that persecution is a reasonable possibility." *Meza–Manay v. INS,* 139 F.3d 759, 763 (9th Cir.1998) (quoting *Singh v. Ilchert,* 63 F.3d 1501, 1506 (9th Cir.1995)). This showing may be made "by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." *Id.* (quoting *Desir v. Ilchert,* 840 F.2d 723, 726 (9th Cir.1988)).

#### 1. *Subjective Component*

Zahedi testified that he feared for his life should he be returned to Iran. The IJ accepted this testimony, explaining that "[t]he Court does not deny that the Respondent does not want to return to Iran." It is therefore undisputed that he has established the subjective component of his well-founded fear of future persecution.

#### 2. *Objective Component*

Zahedi testified to the well-foundedness of his fear and he also introduced a number of documents to support the objective element of his case. The IJ appears to have rejected both the testimonial and

---

4. Zahedi explained that this letter was obtained by a friend who works in the government. The letter also stated that "interrogation of his co-assistant (called Moshen) … [has] been completed."

the documentary evidence for the same reason: she did not find Zahedi credible. Adverse credibility determinations (1) "must be supported by 'specific, cogent reason[s]'" and (2) "the reasons set forth must be 'substantial and must bear a legitimate nexus to the finding.'" *Akinmade v. INS*, 196 F.3d 951, 954 (9th Cir.1999) (citations omitted). No cogent reasons were advanced by the IJ. Reviewing for substantial evidence, *see id.* at 954, we conclude that the IJ erred because the evidence is such that any reasonable factfinder would conclude that Zahedi has established a well-founded fear of persecution.

### a. Documentary Evidence

■ Zahedi introduced an unusually broad range of documentary evidence supporting his asylum claim. First, he introduced background materials—Amnesty International reports and background information concerning the *fatwa* against Salman Rushdie—that placed his testimony into context. These documents attest to the fact that individuals involved in the publication, translation, or mere possession of *The Satanic Verses* in Iran are subject to arrest, torture, and execution by the state. *See* AMNESTY INTERNATIONAL, IRAN: SERIOUS VIOLATIONS CONTINUE AMID POLITICAL AND RELIGIOUS REPRESSION 2 (1993) (stating that "Many Iranians in exile live in constant fear of extra-judicial execution, a threat extended to non Iranians too—such as the British writer, Salman Rushdie, and individuals involved in publishing or translating his work, *The*

*Satanic Verses*, which provoked a *fatwa* calling for his killing in February 1989.").[5] These materials, while they do help Zahedi establish the objective basis for his claim by placing his testimony into context, cannot establish the claim independently. This court has explained that "the purpose of country conditions evidence ... is not to corroborate specific acts of persecution (which can rarely be corroborated through documentation), but to provide information about the context in which the alleged persecution took place, in order that the factfinder may intelligently evaluate the petitioner's credibility." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir.1999).

The second kind of documentary evidence Zahedi produced, on the other hand, independently established the objective component of his asylum claim. This court has explained that an applicant may establish facts that demonstrate the reasonableness of his claim either "through the production of specific documentary evidence *or* by credible and persuasive testimony." *Id.* at 1159 (emphasis added). *See also Aguilera–Cota v. INS*, 914 F.2d 1375, 1379 (9th Cir.1990) ("Documentary evidence establishing past persecution or threat of future persecution is usually sufficient to satisfy the objective component of the well-founded fear standard."); *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir.1985), *aff'd*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (same).

Zahedi introduced the following documents to support his claim: (a) a copy and translation of a summons and notice for Abbas Zahedi to appear in court for inter-

---

**5.** The INS introduced the Department of State's *Profile of Asylum Claims and Country Conditions: Iran*, which explains that "Systemic abuses include extrajudicial killings and summary executions; widespread use of torture and other degrading treatment; disappearances; arbitrary arrest and detention; lack of fair trials; harsh prison conditions; and repression of the freedoms of speech, press, assembly, association, and religion, as well as infringements of the right to privacy." Department of State, *Profile of Asylum Claims and Country Conditions: Iran* 3 (1996). Fur-

thermore, the Department of State's 1995 *Country Reports on Human Rights* also included in the record, explains that "[t]he Government made no effort to repudiate the 1989 religious decree condemning to death British author Salman Rushdie for his book, The Satanic Verses, which the government considers blasphemous. Nor did the government move to repudiate the promise of a cash award to any person who kills Rushdie or anyone associated with publishing his book." Department of State, *Country Reports on Human Rights* 1156 (1995).

rogation, dated April 14, 1996; (b) a copy and translation from a notice published in the Iranian official gazette declaring the hearing time and location for Abbas Zahedi to appear in court to answer allegations of "activities against the Islam Religion and reproduction and distribution of the misleading book of 'Satanic Verses'"; (c) a copy and translation of a letter from the Bureau of Investigation at Ewin Jail to the Islamic Revolutionary Court stating that "the above accused has been active in reproduction and distribution of the misleading book of 'Satanic Verses,'" and (d) a copy and translation of Moshen's death certificate, which did not state the cause of death. If accepted by the court, these documents, taken together, independently make out the objective component of Zahedi's asylum claim: they state the applicant's name, specify the political crime of which he has been accused, and demonstrate that the authorities are actively seeking to arrest and try him for his political activities.

▇▇▇▇ Although the IJ later rejected the validity of Zahedi's proffered documents, the evidence was included in the record and was referred to by the IJ; we therefore treat the documents as having been admitted into evidence.[6] Following a long discussion of Zahedi's purported testimonial inconsistencies (discussed below), the IJ concluded that "this Court does not believe the testimony of the respondent, nor the validity of the documents provided by the respondent." These rejections were unwarranted.

▇▇▇▇ We have not had occasion squarely to articulate the standard governing an IJ's rejection of documentary evidence once the evidence has been admitted into the record.[7] This may be because it is

---

**6.** Our case law makes clear that the admissibility of documentary evidence is governed, like immigration proceedings as a whole, by the Fifth Amendment's Due Process Clause. *See Ladha v. INS*, 215 F.3d 889, 904 (9th Cir.2000) (identifying the due process guarantee to "a full and fair hearing ... and a reasonable opportunity to present evidence" as the standard for the admissibility of evidence in the immigration context). The due process standard is supported by the statutory scheme governing immigration proceedings, which provides aliens with "a reasonable opportunity to examine the evidence against [them], to present evidence on [their] own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B) (2000). We have interpreted the statute and the due process principles animating it to require that evidence may be admitted so long as the evidence is probative and insofar as its admission would be "fundamentally fair." *See Ladha*, 215 F.3d at 904 (examining *Espinoza v. INS*, 45 F.3d 308, 310, 311 (9th Cir.1995)); *accord Cunanan v. INS*, 856 F.2d 1373, 1374 (9th Cir.1988) (explaining that the test for admissibility in deportation proceedings is "whether the hearsay statement is 'probative' and whether its admission is 'fundamentally fair.'").

**7.** In *Barraza Rivera v. INS*, 913 F.2d 1443, 1448–49 (9th Cir.1990), we denied an alien's claim that his due process rights were violated when the BIA failed to "discuss the background information [he] submitted." We rejected the due process claim because there was no evidence that the documents were not reviewed by the BIA. Instead, the Board examined the full record and one member even analyzed specific items of documentary evidence. We therefore concluded that "fundamental fairness" had been observed in the proceedings. In a recent case, the *Barraza Rivera* approach was taken one step further. In *Larita–Martinez v. INS*, 220 F.3d 1092, 1095 (9th Cir.2000), we held that "an alien attempting to establish that the Board violated his right to due process by failing to consider relevant evidence must overcome the presumption that [the Board] did review the evidence." The *Martinez* approach is like that taken by the First Circuit in *Morales v. INS*, 208 F.3d 323, 328 (1st Cir.2000), where the court rejected a due process challenge alleging that the IJ ignored substantial documentary evidence supporting the alien's asylum claim. The court found no due process violation because "there is no indication that the IJ ignored" the documentary evidence, and noted that "each piece of evidence need not be discussed in a decision" in order to satisfy due process. *Id.* (quotations and citation omitted).

Because these cases presented due process challenges to alleged failures to adequately review the record, we do not find in them the guidance we seek. Our case is different from these cases for two reasons: first, Zahedi introduced evidence aimed at making out the objective element of his claim, not merely background information that might support

obvious that the same standards governing credibility determinations by an IJ also apply to documentary evidence. *See Ladha*, 215 F.3d at 905 n. 17 (using testimonial evidence standard to examine IJ's treatment of documentary evidence). An IJ must follow the same rules regarding documentary evidence as she does concerning testimonial evidence. In our circuit, adverse credibility findings must be based on specific, cogent reasons that bear a legitimate nexus to the finding. *See Akinmade*, 196 F.3d at 954. With respect to documentary evidence then, when rejecting the validity of a document admitted into evidence, an IJ must provide a specific, cogent reason for rejecting it, and this reason must bear a legitimate nexus to that rejection.[8]

 In this case, the IJ's reasons for rejecting the alien's documentary evidence were the exact same reasons cited for rejecting his testimony. The IJ concluded that Zahedi was inconsistent and vague at times, and rejected the proffered documents on this basis. Testimonial vagueness and inconsistency are not reasons that bear a legitimate nexus to the rejection of documents concerning a foreign government's pursuit of an alien for engaging in political activity. Nowhere does the IJ discuss the particular indicia of reliability or lack thereof concerning the documents. Included in the record is a letter from the INS's Forensic Document Laboratory concerning Moshen's death certificate and Zahedi's summons. The Laboratory's letter explains that it could not authenticate the documents, but also points out that it could not conclude that the documents were counterfeit either. More specifically, the Laboratory explained that there were no "significant security features" on either document. We are left in the dark as to what "security features" the Laboratory referred to. In light of this inconclusive and unhelpful expert evidence, the IJ had a responsibility to make findings, based on the individual documents and the circumstances surrounding them, and concerning the reliability of the evidence, before she rejected the items.[9] Instead, she rejected the documents summarily.[10] The IJ simply failed adequately to consider whether Zahedi had made out his asylum claim on the basis of documentary evidence.

 Taken together, the facts contained in the summons, the notice, and the letter from the bureau of interrogation demonstrate that Zahedi has been actively sought for punishment (arrest, interrogation, possible detention) by the Iranian authorities for his political activities (distribution of *The Satanic Verses*). When placed alongside the background materials demonstrating that individuals accused of

---

his claim and make it believable; and second, the IJ based her finding in part on an *explicit rejection* of the validity of his evidence.

8. We find background support for this holding in two cases from our sister circuits. The Seventh Circuit has required that the IJ and the BIA, when rejecting documents, must "enlighten[ ] us as to why they found [documents] to be unconvincing." *Nasir v. INS*, 122 F.3d 484, 488 (7th Cir.1997). The Eighth Circuit has applied the same credibility test used to measure testimonial credibility findings to documents proffered by an alien. *See Daiga v. INS*, 183 F.3d 797, 798 (8th Cir. 1999) (per curiam).

9. A clear statement of legitimate reasons for rejecting documents is especially important in a case like this, where the reasons for the Laboratory's inability to authenticate the documents may be applied to a broad range of authentic documents from any country. Indeed, many official documents from our own court system could not pass the Laboratory's test of bearing "significant security features," since they do not always bear authentication signatures, official seals, watermarks, or the more technically sophisticated security features like holograms or bar codes.

10. Further compounding the IJ's failure to make an adequate finding concerning the documents is her statement—seemingly based on the documentary evidence—that "Respondent may face criminal charges when he returns to Iran. That is a matter for the government of Iran to decide. This is not a basis for the grant of asylum." This statement seems to indicate that the IJ gave some weight to the documents concerning the authorities' desire to arrest Zahedi.

this same "crime"—translating or distributing *The Satanic Verses*—have been tortured and executed, the documents have a ring of truth. The objective component of the asylum claim is complete even without Zahedi's testimony. We conclude Zahedi has an objectively well-founded fear of persecution on account of political opinion; he is thus within the statutory definition of a refugee. *See* 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). Because the evidence in the record would compel any reasonable factfinder to conclude that he is eligible for asylum, we reverse the BIA and the IJ.

### b. *Testimonial Evidence*

■ The IJ rejected Zahedi's testimony because she found it to be (a) evasive, (b) general, and (c) inconsistent. To be valid, this finding (1) "must be supported by 'specific, cogent reason[s]' " and (2) "the reasons set forth must be 'substantial and must bear a legitimate nexus to the finding.' " *Akinmade*, 196 F.3d at 954 (citations omitted). The IJ's analysis does not meet this standard.

■ We have previously explained that whether an applicant has been evasive or not can be evaluated by a review of the record:

> We do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion, and determine whether the reasoning employed by the IJ is fatally flawed. It is not enough that the IJ has arrived at point B from point A, or that others might also; the question we must answer is: was it reasonable to do so?

*Aguilera–Cota v. INS*, 914 F.2d at 1381. In this case, the IJ found that "Respondent was very evasive at the merits hearing when it came to specific dates of incidents." A review of the record reveals otherwise; indeed, Zahedi tried to give specific dates but was often hampered by his reliance on the translator to convert those dates from the Islamic to Christian calendar. For example, when asked his birth date, the following colloquy ensued:

Q: And, what's your date of birth?

A: (Interpreter) Okay, this is his birth date in Farsi language, 11–22—In Farsi, the birth date is 1–9–1335.

Q: Okay—what—can you translate that into—

A: I will take couple minutes—if you want me—

JUDGE TO MS. CARNEY

Q: Counsel, you could lead on that.

A: Okay.

MS. CARNEY TO MR. ZAHEDI

Q: Is your birthday under the American system, 11/22/56—1956?

A: (Interpreter) Eleven–

Q: 11/22/1956

A: 1956. Uh, well, I'm not sure, the Farsi, the best date in Farsi, I give you is that my—I—the other one has been translated, she says, I don't know about that.

The transcript shows that the translator did not feel comfortable with his ability to quickly translate dates between Farsi and English (or to convert them from the Islamic to the Christian system). Nevertheless, throughout the hearing, questions concerning dates continued to be dealt with in this unhelpful manner. Zahedi attempted to answer as best he could by relating events to each other; for example, he stated that he discovered that Moshen had been arrested twenty days before he left Iran, that he was in Turkey during "Ramadan of the last year," and that he arrived in Bellingham around lunchtime. While it is true that these answers might be frustrating to one trying to make a clear timeline, since they are relational rather than fixed dates, these answers are by no means evasive. Instead, Zahedi appears to have tried to give the best answers he could to the questions posed concerning dates. As this court has explained, "minor discrepancies in dates that are attributable to the applicant's language problems ... and cannot be viewed

as attempts by the applicant to enhance his claims of persecution have no bearing on credibility." *Damaize–Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986). Here, Zahedi was not enhancing his claim with any of the confusing dates, and the confusion seems to have stemmed, at least in part, from language problems. For this reason, we find that the IJ's "evasiveness" finding was not supported by substantial evidence.

The IJ also explained that Zahedi "testified very generally about his activities as to the distribution of the Satanic Verses. He could not give any details about what he did. He could not provide specifics as to the people to whom he distributed the Satanic Verses." At the merits hearing, Zahedi explained that Moshen translated the text; that Zahedi photocopied the translations chapter by chapter; and that Zahedi gave copies of these chapters to about twenty-five people. He further explained that he gave copies to families he knew from his home town of Arak; he volunteered the name of one of these individuals, but was never asked for more details. In fact, neither the IJ nor counsel for the INS ever asked Zahedi to list the names of individuals or indicated that he had not given enough detail concerning his activities. In light of this, the IJ's conclusion that Zahedi "could not" provide more detail was not "supported by 'specific, cogent reason[s].'" *Akinmade*, 196 F.3d at 954.

The facts concerning who knew what when about Moshen's arrest, torture, and death are somewhat confusing and form the basis for much of the IJ's credibility determination. Under questioning, Zahedi made a number of statements regarding when he found out about Moshen's arrest, torture, and death. The IJ felt these dates did not mesh: she was concerned that he had changed the dates on which he "found out" about Moshen's arrest, torture, and death. From an examination of the record, we could find only one true inconsistency. On his asylum application, dated October 7, 1996, Zahedi explained that he heard from his mother on April 15 that Moshen had been arrested, and that he "soon" fled to Canada. In fact, Zahedi left Teheran on April 14 and arrived in Canada on April 15; at his merits hearing, Zahedi said he learned of Moshen's arrest about twenty days before he left, and that it was the arrest that prompted him to flee Iran. This inconsistency is one of dates rather than chronology. In light of the clear language barrier between Zahedi and his attorney, and the petitioner's plausible explanation that this sentence in the asylum application was badly crafted, this inconsistency was not significant enough under our caselaw to warrant an adverse credibility finding. As we have explained, " 'inconsistencies of less than substantial importance for which a plausible explanation is offered' cannot form the sole basis for an adverse credibility finding." *Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999) (quoting *Garrovillas v. INS*, 156 F.3d 1010, 1014 (9th Cir.1998)).

The remaining points the IJ identifies as inconsistencies are not true inconsistencies. Instead, they are statements that are confusing because they each deal with different levels of "finding out," "knowing about," or "discovering" that Moshen was arrested, tortured, and killed. On his asylum application, Zahedi explained that "when [he] arrived in Canada," he talked to a friend on the telephone and was told that Moshen had died as a result of torture, but that "not even the family was informed of the death." At the merits hearing, Zahedi testified that he learned the details of Moshen's torture and death from a letter his brother sent dated December 4, 1996. Zahedi also testified that friends within the Iranian government told him a month or two before he received his brother's letter that Moshen had been killed. Finally, Zahedi explained that his brother had gotten details concerning Moshen's torture and death from a friend of his who worked for the Iranian military named Colonel Moradi.

The following colloquy exemplifies the confusion that ensued when the INS attor-

ney was attempting to discover the *timing* of Zahedi's discovery that Moshen has been arrested. Zahedi appears to take the question as an inquiry about when Zahedi learned *exactly what happened* to Moshen:

Q: When did you become aware of what happened to [Moshen]?

A: Some of his letters that I received from Iran, they explained what happened to [Moshen].

Q: That was the first time that you heard about that?

A: That was the last time.

Q: When did you first hear that [Moshen] had been arrested?

A: That—I was in Iran at that time.

At this point, the IJ began to question Zahedi directly, apparently frustrated with his answers:

JUDGE TO MR. ZAHEDI

Q: When, sir?

A: Twenty sixth or twenty seventh of month—when I called my mother, and I got no—I was told that [Moshen] is being arrested.

Q: Sir, you just now said that you knew of what happened to [Moshen] when you were in Iran. What day of the month was it? What month was it?

A: I was in Iran when I was, uh, I, I got informed that [Moshen] is arrested, the I went—aft—right after that, I went to see a friend that he arranged a departure from Iran.

Q: Sir, I'm not talking about your departure. I know when you left Iran, okay? That's in the record. The question was, what month or day if you remember did you first find out that [Moshen] was arrested?

A: Month is (untranslated) 13, 75 is the year.

When read as a whole, the record makes clear that Zahedi discovered bits and pieces of Moshen's story over time and from a number of different people. This makes sense in light of the highly secret and dangerous nature of the infor-

mation, and it also made his examination and cross-examination confusing. It is also clear that there were significant communication and translation problems concerning dates during the asylum hearing. None of them were crucial to his claim. We conclude that the IJ's adverse credibility finding was not supported by substantial evidence and that Zahedi supported his asylum claim with substantial evidence.

### III.

 Since the IJ found that Zahedi was not eligible for asylum, she rejected his application for withholding of deportation. To be eligible for withholding, an applicant must establish "a clear probability of persecution" upon return, which has been interpreted to mean that it is "more likely than not" that the applicant will be persecuted. *Duarte de Guinac,* 179 F.3d at 1164 (citation omitted). This court has explained that " 'a key factor in finding evidence sufficient for withholding of deportation is whether harm or threats of harm were aimed against petitioner specifically.' " *Id.* (quoting and citing *Gonzales–Neyra v. INS,* 122 F.3d 1293, 1297 (9th Cir.1997), *amended by Gonzales–Neyra v. INS,* 133 F.3d 726 (1998)). In this case, both Zahedi's testimony and the documents he provided establish that the Iranian government was actively pursuing him personally for his activities related to translating and distributing *The Satanic Verses.* It is highly likely that if Zahedi were to return to Iran, he at the very least would be imprisoned, and at the worst tortured or executed for distribution of *The Satanic Verses.* Under such circumstances, a grant of withholding of deportation is appropriate.

Petition for review GRANTED; RE-MANDED for the exercise of the Attorney General's discretion with respect to the asylum claim, and for the grant of withholding of deportation.