REINHARDT, Circuit Judge.
Raj Kumar (Raj), an Indian citizen and native of the northern Indian state of Jam-mu and Kashmir, petitions for review of the Board of Immigration Appeals’ (BIA) order affirming, without an opinion, the denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). He also petitions for review of the BIA’s denial of his motion to reopen. We conclude that the Immigration Judge (IJ) erred in finding (1) that Raj was not credible, (2) that Raj had not established a nexus between his past persecution and at least one of the five protected grounds enumerated in 8 U.S.C. § 1101(a)(42)(A), and (3) that Raj had failed to demonstrate a reasonable fear of future persecution.
FACTUAL AND PROCEDURAL BACKGROUND
According to Raj’s sworn declaration, in the early morning of January 6, 1998, police officers stopped him as he walked to his neighborhood temple in Jammu and Kashmir and asked him whether he knew the whereabouts of Syed Ali Shah, whom the police had identified as a suspected terrorist and Muslim separatist. Raj pointed the officers in the direction of Shah’s house but initially refused to accompany them there, in part because he did not believe that Shah was a terrorist. After the officers physically assaulted Raj and threatened him with arrest and possible death if he did not cooperate, he agreed to lead them to Shah’s house.
When Raj and the police arrived at Shah’s residence, Shah answered the door carrying a gun. Upon seeing that Raj was with law enforcement personnel, Shah attempted to flee and was shot by the officers and thereafter arrested. After Shah’s arrest, Raj was released by the police. Several hours later, individuals associated with Shah came to the Kumar home and, believing that Raj had been involved in Shah’s arrest, began yelling threats and throwing stones at the house. That evening, Raj and his brother Rajinder were arrested by the local police. The arresting officers informed them that Shah had died from his gunshot wounds but, prior to his death, had told the police that Raj and Rajinder were involved in terrorist activities.
The brothers were taken to the police station, where Raj was repeatedly and severely beaten with wooden sticks and leather belts by officers who told him that he would be killed if he did not disclose the identities of Muslim terrorists and reveal information about their planned terrorist activities. Despite Raj’s truthful pronouncements that he was not involved with any militant or terrorist organization and could not provide the police with any relevant information, his confinement and physical abuse continued until February 6, *1023 1998, when his father successfully bribed a police officer to release him along with his brother.
When Raj returned home from the police station he discovered that, during his confinement, individuals associated with Shah who were involved with Muslim terrorist organizations had come to the Ku-mar home seeking revenge for Shah’s arrest and death. These individuals had killed Raj’s brother Ram and also threatened to kill Raj, Rajinder and other members of the Kumar family. When Raj and Rajinder learned of these threats, they fled India; the two brothers arrived in the United States by way of Germany and Canada on February 26, 1998, and subsequently separated.
On or about April 24, 1998, Raj applied for asylum and withholding of removal. At a brief preliminary hearing before the IJ on December 16, 2000, Raj additionally requested relief under CAT. A hearing on the merits of Raj’s case was held on May 25, 2000. At that hearing, Raj submitted in evidence, among other things, his sworn declaration detailing the events described above, Rajinder’s application for asylum, the death certificate for his brother Ram which was sent from Jammu and Kashmir, a letter from his mother and father stating that a newly-appointed police official had threatened to kill him if he returned to India, and several photographs depicting injuries suffered from the beatings at the police station. Also in evidence were country reports from India which stated, among other things, that India was the site of significant civil rights abuses stemming from “deficient police methods and training” as well as “violent secessionist movements” responsible for “extrajudicial executions and other political killings, torture, and brutality.” These problems were “acute in Jammu and Kashmir,” where “torture and rape by police” and “arbitrary arrest and incommunicado detention” operated in conjunction with a “judicial system [that] barely functions.”
On September 14, 2001, the IJ denied Raj’s applications for asylum, withholding of removal, and relief under CAT. The IJ based the decision on his findings (1) that Raj was not credible, (2) that Raj had failed to establish a nexus between the harm suffered and a protected ground, and (3) that the threat of future persecution was speculative and thus Raj’s fear of it was not reasonable.
With respect to his first finding that Raj was not credible, the IJ concluded that Raj had submitted fraudulent documentary evidence. Specifically, the IJ determined that a number four written on the date line of Rajinder’s asylum application was “precisely the same peculiar and uniquely styled” number four that was written on Ram’s death certificate. Based upon this and nothing more, the IJ surmised that the death certificate was likely forged by Raminder Singh, who had prepared the asylum applications for both Raj and Ra-jinder.
The IJ also noted that several of the photographs attached to Raj’s asylum application which purported to show injuries that he had suffered at the hands of the Indian police officers were identical to photographs attached to Rajinder’s application. The IJ concluded based upon this finding that Raj was attempting to claim injuries that were actually suffered by his brother. The IJ also stated that he did not believe Raj’s contention that he did not know where Rajinder was at the time of the hearing, despite Raj’s' statements that Rajinder was a truck driver and that the brothers had separated out of economic necessity. According to the IJ, these considerations taken -together with what the IJ determined to be inconsistencies between Raj’s factual allegations and the In *1024 dian country reports required an adverse credibility finding.
Second, the IJ ruled that, even if Raj was credible, he was ineligible for asylum because he had failed to establish a nexus between the harm that he had suffered and at least one of the five grounds protected by the asylum provision of the Immigration and Nationality Act (INA). On this point, the decision stated as follows: “[Raj] has no political contact nor associations with any group whatsoever. He had no contacts with any militants.... Here, questions were asked and a confession requested. That was the extent of the testimony about a nexus about the harm suffered and one of the five enumerated grounds from the respondent.” With respect to his third finding that Raj had also failed to establish a reasonable fear of future persecution, the IJ cited only evidence that Raj’s parents remained in India and had not been harmed by the separatist factions that had killed Raj’s brother and threatened the lives of Raj and Rajinder. Based upon these three findings, the IJ denied Raj’s application for asylum.
Incorporating by reference his analysis of Raj’s asylum claim, the IJ also denied Raj’s application for withholding of removal because that standard is more difficult to meet than the asylum standard. He ruled that because Raj could not meet the lesser asylum standard, he necessarily could not meet the stricter standard for withholding of removal.
Lastly, the IJ determined that Raj was not entitled to relief under CAT. The IJ cited his credibility ruling and further held that, even if Raj’s allegations were true, the harm that he had suffered at the police station did not rise to the level of torture as that term is defined under CAT.
On December 13, 2002, the BIA affirmed the IJ’s decision without an opinion. Raj filed a motion to reopen, which the BIA denied. He subsequently petitioned for review of both rulings. This appeal consolidates the two petitions for review, although Raj’s brief does not address the denial of his motion to reopen.
STANDARD OF REVIEW
We review for substantial evidence the BIA’s decision that an applicant has not established eligibility for asylum. Njuguna v. Ashcroft, 374 F.3d 765, 769 (9th Cir.2004). Under that standard, the BIA’s determination must be upheld if it is supported by reasonable, substantial and probative evidence from the record. Knezevic v. Ashcroft, 367 F.3d 1206, 1210-11 (9th Cir.2004); see also INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (“[t]o reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it”).
We also review under the substantial evidence standard the BIA’s decision that an applicant has not met the higher burden required for withholding of removal, Thomas v. Ashcroft, 359 F.3d 1169, 1174 (9th Cir.2004) reh’g en banc granted, 382 F.3d 1154 (9th Cir.2004), su-perceded sub nom. Thomas v. Gonzales, 409 F.3d 1177 (9th Cir.2005), and the findings underlying its decision that an applicant is not eligible for relief under CAT. Bellout v. Ashcroft, 363 F.3d 975, 979 (9th Cir.2004). Adverse credibility determinations are also reviewed under the substantial evidence standard. Tawadrus v. Ashcroft, 364 F.3d 1099, 1102 (9th Cir.2004).
Where, as here, the BIA adopts the reasoning of the IJ without an opinion of its own, we review the decision of the IJ applying the rules set forth above. Zahedi v. INS, 222 F.3d 1157, 1162 (9th Cir.2000).
*1025 ANALYSIS
I. Adverse Credibility Finding
A Purported Forgery of Ram’s Death Certificate
The IJ found that Raj was not credible, relying in large part upon his determination that Ram’s death certificate, which was submitted in support of Raj’s asylum application, was likely a forgery. The sole reason the IJ posited to support this conclusion was that the death- certificate contained a “peculiar and uniquely styled” number four that was similar to a number four handwritten in Rajinder’s asylum application. Because Rajinder’s application was prepared by Singh, as Raj’s was, the IJ concluded that Singh had forged the death certificate.
 “We do not accept blindly an IJ’s conclusion that a petitioner is not credible.” Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir.1990). Rather, we examine the record to determine “whether substantial evidence supports that conclusion, and ... whether the reasoning employed by the IJ is fatally flawed.” Id. Adverse credibility findings may not be based upon speculation or conjecture. Vera-Villegas v. INS, 330 F.3d 1222, 1231 (9th Cir.2003). In judging the veracity pf documentary evidence, the IJ must use the same standard he would in judging the credibility of testimonial evidence: “an IJ must provide a specific, cogent reason for rejecting [the evidence], and this reason must bear a legitimate nexus to that rejection.” Zahedi, 222 F.3d at 1165.
It would be difficult to imagine a more precise example of “speculation and conjecture” than the IJ’s finding, based upon nothing more than his own uninformed visual comparison of the two number fours at issue, that Singh had forged Ram’s death certificate. In fact, the date containing the “suspect” number four in Rajin-der’s asylum application was not “4/29/98,” as the IJ stated in his decision, but rather “4/24/98,” as verified by the corresponding typewritten date on the following page. Thus, although the IJ was willing to brand the death certificate a forgery based upon his own visual comparative handwriting analysis of a number four in Rajinder’s asylum application, he misidentified a different number four in the same date in'the same document.
Further, the IJ failed to substantiate his opinion regarding the legitimacy of Ram’s death certificate by submitting the documents to a-handwriting expert or forensic laboratory for review or testing. Athough there is no rule in this circuit that IJs must consult experts prior to rejecting documentary evidence, in several cases in which IJs have made adverse credibility findings based upon forged documents, those findings have been supported by evidence from experts. See, e.g., Yeimane-Berhe v. Ashcroft, 393 F.3d 907, 910 (9th Cir.2004) (INS submitted a report from its forensic docurnent laboratory stating that the medical certificate at issue was a forgery); Zahedi, 222 F.3d at Í165 (IJ relied upon a letter from the INS laboratory which stated that it could not authenticate a de.ath certificate).
Here, the IJ sought no support for his opinion that the two “peculiar and unique” number fours were handwritten by the same person, nor did the government proffer any expert evidence to support that conclusion. Accordingly, the IJ’s determination that Ram’s death certificate was forged was fortified by no evidence other than his own visual handwriting analysis, which as discussed ¿bove, was both uninformed and inaccurate. The IJ’s conclusion, on this basis, that Ram’s death certificate was a forgery was nothing more than conjecture unsupported by the evidence in *1026 the record. Thus, we are compelled to reject it.[1]
The IJ’s finding that Ram’s death certificate was a forgery must be rejected on a second ground as well: the IJ failed to provide Raj with the opportunity to explain the perceived similarity between the numerals in the death certificate and Rajinder’s asylum application. See Campos-Sanchez v. INS, 164 F.3d 448, 450 (9th Cir.1999) (“[T]he BIA must provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of asylum.”). In fact, the IJ was obliged not only to allow Raj to explain the supposed similarity, but also to consider and address that explanation in his decision, which he failed to do. Kaur v. Ashcroft, 379 F.3d 876, 887 (9th Cir.2004) (“An adverse credibility finding is improper when an IJ fails to address a petitioner’s explanation for a discrepancy or inconsistency.”). The failure on the part of an IJ to allow a petitioner the opportunity to respond to questions regarding his credibility, particularly when such questions form the basis for the denial of asylum, amounts to the denial of due process. Mendoza Manimbao v. Ashcroft, 329 F.3d 655, 661 (9th Cir.2003). There can be no doubt that Raj’s due process rights were violated here.[2]
B. Photographs
The IJ also concluded, after comparing photographs in Raj’s asylum application to those submitted in support of Rajinder’s application, “that in fact, some of the alleged injuries and photos about them were actually photos of respondent’s brother, and not his at all.” The IJ found that Raj’s attempt to “pass off’ his brother’s injuries as his own was “consistent with [his] attempts to deceive this Court about the veracity of his claim to asylum.”
During Rajinder’s testimony, he acknowledged that several of the photographs that were included in both his and his brother’s asylum applications depicted injuries suffered by Raj. Rajinder explained that his application, as well as Raj’s, was prepared by Singh, and that it was possible that Singh had inadvertently attached photographs to his application that were meant to support only Raj’s. There was one photograph (not “some”), however, that was included in Raj’s asylum application that showed injuries to Rajin-der’s foot. In Rajinder’s asylum application, that photograph was labeled “my foot,” whereas it contained no such label in Raj’s application. This appears to be the only photograph in Raj’s asylum application that depicts an injury suffered by Rajinder.
In Rajinder’s file, in fact, the other photographs were labeled as depicting Raj’s injuries, presumably because corroboration of injuries to both brothers was relevant to the events recounted by Rajinder in his application (events nearly identical to those described in Raj’s application). The inclusion of a single photograph of Rajin-der’s foot injury in Raj’s set of photographs submitted to the INS is consistent *1027 with this notion. Raj did not, in his testimony or on the photographs themselves, specifically identify the foot in the picture as his own, although he did so identify one other photograph. Thus, any clerical error in the assembly of Raj’s application and supporting evidence resulted almost surely from a careless failure by Singh to mark the photographs accurately, not from an attempt to pass off a single, inconsequential injury of Rajinder’s as having been incurred by Raj.[3] There is no reason why the preparer would have labeled the photographs in Rajinder’s file accurately but purposely failed to label similarly the same photographs in Raj’s file, particularly as most of the photographs in Raj’s file were of his own injuries and those injuries were the more serious.
Among the extensive evidence submitted in support of Raj’s asylum application, including evidence of serious injuries suffered by Raj such as a torn muscle that required surgery and crushed fingers, the discrepancy created by a single unlabeled photograph depicting a minor injury to Rajinder’s foot is in question. Discrepancies such as the one presented here that are capable of being attributed to clerical errors may not form the basis of an adverse credibility finding “unless the IJ or the BIA specifically explains the significance of the discrepancy or points to the petitioner’s obvious evasiveness when asked about it.” Shah v. INS, 220 F.3d 1062, 1068 (9th Cir.2000). Neither condition is satisfied in this case. The IJ did not explain his reason for rejecting a clerical explanation for the failure to label the photographs properly, as was done in Ra-jinder’s application. Nor was the petitioner asked for an explanation, so he was not “evasive” in responding. We conclude, therefore, that the IJ’s determination that Raj attempted to “pass off’ his brother’s injuries as his own is not supported by substantial evidence. Thus, we are compelled to reject this ground for the IJ’s credibility finding as well.
C. Contact with Rajinder
The IJ stated in his decision that “[i]t is also inconsistent with credibility for the respondent to lead this Court to believe, his brother and the respondent made their way to the United States and then separated.” The IJ’s only support for this finding was his opinion that it was “unusual” for Raj not to know the whereabouts of Rajinder after they had grown up and fled India together.
In Shah, this circuit ruled that an IJ had improperly discounted a petitioner’s credibility on the basis of his disbelief that the petitioner and her husband had not received more correspondence than they had submitted from a certain political party for whom the husband had worked for ten years. 220 F.3d at 1071. The Shah court ruled that such disbelief amounted merely to speculation and conjecture. Id. In Lopez-Reyes v. INS, 79 F.3d 908, 912 (9th Cir.1996), the IJ found “astonishing” the petitioner’s contention that he had not been killed by guerillas after being chased, shot at and beaten. In that case as well, the court rejected the IJ’s finding, ruling that the conclusion was not based upon a cogent reason, but rather upon “personal conjecture about what guerillas likely would and would not do.” Id.
Similarly here, the IJ’s adverse credibility determination, insofar as it was based *1028 upon his opinion regarding what brothers from India who had grown up and fled India together might or might not do, was purely conjecture. Further, an examination of the record reveals that Raj’s testimony regarding his knowledge of the whereabouts of his brother was not at all “unusual.” Raj testified at his May 25, 2000, hearing that Rajinder was working with a trucking company somewhere in California and was not easily reachable, that he had seen him “three or four months ago,” and that he had not attempt-, ed to contact Rajinder prior to the hearing because “I did not know that he would also be needed here.” Later in the hearing, the IJ scheduled a status conference for June 9 and directed Raj to locate his brother prior to that date. At the June 9 hearing, Raj’s counsel informed the IJ that Raj had located Rajinder and that he would be able to appear as a witness in Raj’s case.
As was the case in Lopez-Reyes, the IJ’s finding that it was “unusual” that Raj did not know where Rajinder was as of the date of the May, 2000, hearing was imper-missibly based upon personal conjecture rather than supportable, cogent reasoning.
D. Purported Inconsistencies Between Allegations and Country Reports
Last, the IJ’s determinations that Raj’s substantive claims were inconsistent with the factual findings in the Indian country reports and were implausible are not supported by substantial evidence.
With respect to the IJ’s finding that Raj’s narrative was inconsistent with the Indian country reports, the IJ stated in his decision that there was no support in the country reports for Raj’s claims (1) that the local police in Jammu and Kashmir asked him, a civilian, for the whereabouts of Shah, a suspected terrorist, and then compelled him to accompany them to Shah’s home, and (2) that the police later arrested him based upon Shah’s statement that Raj was involved in terrorist activities. A review of the Indian country reports submitted into evidence in this case compels us to conclude that the IJ’s findings regarding country conditions are not only unsupported by substantial evidence, they are clearly erroneous. Although the Indian country reports do not detail identical incidents to those described by Raj in his sworn affidavit, they do warn of “deficient police methods” and violent police suppressions of Muslim separatist movements. In Jammu and Kashmir, the tensions between local authorities and the terrorist elements are so severe, local government security forces have regularly “killed suspected militants and civilians; with few exceptions, they acted with impunity.” Further, the authorities act in this regard with “judicial tolerance of the Government’s heavy-handed antimilitant tactics.”
Second, Raj’s account of the events of January 6, 1998, is not implausible, and it is certainly not a basis for finding his testimony not credible. Raj testified that his family owned a tailoring shop in his village, and that he often would deliver finished garments to his customers’ homes. Shah’s home was in very close proximity to the Kumar shop and, although Raj had never personally delivered anything to Shah, Shah was a customer and Raj knew where Shah’s house was because he regularly “used to pass by that way.” Raj also testified that the officers who accosted him came from the local police station, which was three to four miles away from his family’s shop and the Shah residence. It would not be implausible for police officers to drive three to four miles from their headquarters into a remote neighborhood looking for a suspected terrorist, and then to ask an individual from that neighborhood where the suspected terrorist lived. The IJ’s opinion, unsupported by any evi *1029 dence, as to what local police in Jammu and Kashmir might or might not do in their efforts to find a suspected criminal is based upon speculation and conjecture. Lopez-Reyes, 79 F.3d at 912.
Thus, Raj’s account of the police officers’ treatment of him during the early morning of January 6, 1998, and his statements regarding his subsequent arrest and beatings are both consistent with the Indian country reports cited by the IJ and are plausible. The IJ’s findings to the contrary, like the other factual findings underlying his adverse credibility determination, are not supported by substantial evidence.
In view of the above, Raj’s testimony must be deemed credible.[4]
II. Nexus Between Persecution and Protected Ground
In addition to holding that Raj was not credible, the IJ ruled in the alternative that he had failed to establish past persecution on the basis of a qualifying protected ground. The IJ’s ruling relied upon his finding that Raj was a law-abiding citizen with no political contact or affiliation with any terrorist or militant organization, and thus was not persecuted based upon any political opinion or association.
It is settled law that an applicant may establish a political opinion for purposes of asylum relief by showing an “imputed political opinion.” See Sangha v. INS, 103 F.3d 1482, 1489 (9th Cir.1997). And, we have repeatedly held that an applicant can establish imputed political opinion based upon the persecutor’s erroneous belief as to the applicant’s political affiliation or opinion. See, e.g., Singh v. Ilchert, 63 F.3d 1501, 1508-9 (9th Cir.1995) (finding an imputed political opinion where Indian police officers persecuted the petitioner based upon a false belief that he was affiliated with Sikh militants); Blanco-Lo-pez v. INS, 858 F.2d 531, 533-34 (9th Cir.1988).
Here, the evidence in the record shows that Raj endured a month-long detention and serious physical abuse as a result of the Jammu and Kashmir police’s mistaken belief that Raj was associated with a Muslim terrorist group. The fundamental fact relied upon by the IJ in ruling that Raj had failed to establish a nexus between persecution and a protected ground — that Raj was not in fact a member of a terrorist organization — is irrelevant to the imputed political opinion analysis. Rather, “the focus of inquiry turns away from the views of the victim to the views of the persecutor .... If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant’s political opinion as required under the Act.” Sangha, 103 F.3d at 1489 (citation omitted). The facts in this case are substantively indistinguishable from those in Singh and Sangha; the evidence is clear that Raj was detained and physically assaulted on the basis of a political opinion imputed to him. Thus, we must reject the IJ’s finding that Raj did not establish a nexus between his past persecution and a protected ground; the record compels us to rule that Raj has suffered persecution on the basis of an imputed political opinion.
III. Reasonable Fear of Future Persecution
The IJ also ruled that Raj had failed to establish a reasonable fear of future persecution. The IJ found, solely based upon evidence showing that Raj’s parents had not been harmed since he fled the country, that Raj’s fear of persecution *1030 by local law authorities in Jammu and Kashmir was “speculative.”
In order to establish a reasonable fear of future persecution, an applicant must show that his fear of persecution is both subjectively genuine and objectively reasonable. Hoxha v. Ashcroft, 319 F.3d 1179, 1182 (9th Cir.2003). An applicant can satisfy the subjective component of the two-part test by credibly testifying that he genuinely fears persecution. Korablina v. INS, 158 F.3d 1038, 1044 (9th Cir.1998). He can satisfy the objective by “showing [ ] credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution.” Ghaly v. INS, 58 F.3d 1425, 1428 (9th Cir.1995) (citation and quotation marks omitted). That fear “must be based on an individualized rather than generalized risk of persecution.” Hoxha, 319 F.3d at 1182.
Because we find that Raj is credible, and because he has testified that he believes that the local police in Jammu and Kashmir will kill him if he returns to India (a belief that is supported by the letter from his parents so stating), he has satisfied the subjective component of the well-founded fear test.
Further, Raj has also satisfied the objective reasonableness component of the test. According to the Indian country reports, local security forces in Jammu and Kashmir attempting to[1] combat insurgent elements regularly use excessive force, including torture and rape, when dealing with civilians, and they summarily kill suspected terrorists “with impunity,” including those already in police custody. Raj’s fear of such persecution is certainly based upon individualized risk- — -the police’s erroneous belief that he was a terrorist caused him to be subjected to a month-long detention that included severe physical attacks and threats to his life. We may consider the reasonableness of Raj’s fear “in the political, social, and cultural milieu of the place wherefhe] lived, and even a ten percent chance of persecution may establish a well-founded fear.” Khup v. Ashcroft, 376 F.3d 898, 904 (9th Cir.2004) (citations and quotation marks omitted). Here, the acute social and political tensions in Jammu and Kashmir considered together with Raj’s prior experience as the victim of police violence and the letter from his parents stating that local security forces have threatened to kill him if he -returns to India require a finding that he has met his burden of showing a well-founded fear of future persecution.
The fact that Raj’s parents have not been harmed in his absence does not compel a different result. This court did hold in Hakeem v. INS, 273 F.3d 812, 816 (9th Cir.2001), that “[a]n applicant’s claim of persecution upon return is weakened, even undercut, when similarly-situated family members continue to live in the country without incident.” However, the facts in Hakeem are entirely distinguishable from those in this case; critically, the family members at issue in Hakeem were in fact “similarly situated,” whereas here they are not. In Hakeem, the petitioner asserted that he would be killed upon returning to Pakistan because, according to the law as decreed in the Koran, an individual who changes his religion, as the petitioner had done, is automatically sentenced to death. 273 F.3d at 817. The court rejected Hak-eem’s claim, in part because several members of his family who had remained in Pakistan and had also changed their religion had not been persecuted. Id.
Here, there is no evidence that the police in Jammu and Kashmir suspect Raj’s parents of associating with the same Muslim separatist faction to which they accuse Raj of belonging. In other words, the political opinion that the Indian police have imputed to Raj and which forms the basis of Raj’s past persecution has not been *1031 imputed to Raj’s parents; thus, they are not “similarly situated,” and it is irrelevant that they have not suffered from the treatment that Raj fears.
The IJ’s finding that Raj failed to establish a well-founded fear of future persecution is not supported by substantial evidence.
IV. Withholding of Removal
The IJ’s denial of Raj’s application for withholding of removal relied exclusively upon his ruling denying Raj’s asylum application. However, we have reversed the IJ’s adverse credibility finding and rejected his rulings that Raj failed to establish (1) past persecution on the basis of a protected ground and (2) a reasonable fear of future persecution.
Because the IJ failed to consider Raj’s claim for withholding of removal on its merits, we remand that claim to the BIA so that it may now consider it in light of our holdings herein.
V. Relief Under CAT
The IJ ruled that Raj was not entitled to relief under CAT because, inter alia, the harm that he claimed to have suffered in the Jammu and Kashmir police station did not rise to the level of torture as defined under the statute.
Although Raj undeniably suffered abuse in the Jammu and Kashmir police station, we are unable to conclude that the IJ’s ruling that it did not amount to torture was not supported by substantial evidence. See Gui v. INS, 280 F.3d 1217, 1230 (9th Cir.2002). Thus, we affirm the BIA’s determination that Raj is not entitled to relief under CAT.
VI. Motion to Reopen
Because Raj’s appellate brief does not address the BIA’s denial of his motion to reopen, we consider argument on that issue waived. See Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (“[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant’s opening brief.”) (citation and quotation marks omitted).
CONCLUSION
We reverse the IJ’s adverse credibility finding and hold that Raj has demonstrated both past persecution on account of an imputed political opinion and a well-grounded fear of future persecution. Accordingly, we find Raj statutorily eligible for asylum, and we remand for an exercise of discretion on his asylum claim and for further consideration of his withholding of removal claim. We affirm the BIA’s denial of Raj’s application for relief under CAT. We deny Raj’s petition for review of the BIA’s denial of his motion to reopen.
Petition for review is GRANTED in part, DENIED in part, and REMANDED for further proceedings.

. Were we to offer our own uninformed analysis after examining the various number fours at issue, we would not find any basis for concluding that they were written by the same person, let alone sufficient basis to conclude with the requisite degree of certitude that they were. However, our uninformed visual analysis is of no greater probative value than the IJ's, and we give it no import here.

. The brief that Raj submitted to the BIA explains that he was given no opportunity to respond to the IJ's speculation of forgery and requests a "remand[] to permit forensic examination of the allege[d] forger)'...." In a case such as this, where more objective proof might be easily obtained, Raj ought to have been given' — as he stated to the BIA — an opportunity to respond.

. We note that Singh prepared Raj’s asylum application in English, which Raj does not speak. Thus, Raj likely did not, because he could not, review his application before it was submitted. We note also that Raj’s application contains numerous spelling and grammatical errors, which suggest that Singh was generally careless in preparing Raj's application or was otherwise unqualified or incompetent.

. When our dissenting colleague quotes eleven separate statements from dissenting opinions, mainly his own, it is not difficult to determine that the law is not on his side.

. After Raj told the IJ that he didn’t know where Rajinder was, and hadn’t asked Rajin-der to testify, the IJ said, "Sir, you want me to believe, that the same brother who was detained, beaten, threatened is in the United *1035 States, and you didn’t know that he would be a helpful witness to you. Is that w[hat] you want me to believe? ... Well, sir, I just don’t understand a percipient witness, who had the same problems, in the same family, and he’s not produced in the case in chief. Very difficult for me to understand, sir.” The IJ then continued the hearing to "allow [Raj] time to find [his] brother.”