Teofola Sofia **MEZA–MANAY, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 96–70990.**

United States Court of Appeals, Ninth Circuit.

Submitted* Dec. 11, 1997.

Decided March 24, 1998.

---

* The panel unanimously found this case suitable for decision without oral argument. Fed. R.App. P. 34(a) and Ninth Circuit Rule 34–4.

Amos Lawrence, San Francisco, California, for petitioner.

Ellen Sue Shapiro, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Department of Justice, Washington, DC, for respondent.

Before: BROWNING, PREGERSON, and HAWKINS, Circuit Judges.

PREGERSON, Circuit Judge:

Meza-Manay, a citizen of Peru, petitions for review of an order of the Board of Immigration Appeals ("BIA") denying her asylum application. We have jurisdiction under section 106(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1105a (1996). We grant the petition for review. We reverse and remand.

I

Meza-Manay is a thirty-nine-year-old native and citizen of Peru, who first entered the United States without inspection in the winter of 1981. She briefly returned to Peru in June of 1987, only to reenter without inspection that same summer with her twin sons, Renzo and Ranato, who were born in Peru. Currently, she resides in San Pablo, California with her thirteen-year-old sons.

On July 16, 1992 and October 20, 1992, Meza–Manay was convicted in the municipal court for Contra Costa County of petty theft.[1] She was placed in deportation proceedings pursuant to an Order to Show Cause issued on May 11, 1994, charging her with violating sections 241(a)(1)(b) and 241(a)(2)(A)(ii) of the INA, on the grounds that she entered this country without inspection and thereafter sustained two convictions involving moral turpitude not arising out of a single scheme of criminal misconduct.

Meza-Manay admitted her deportability but sought asylum.[2] She declined to designate a country of deportation should deportation become necessary. On his own motion, the IJ designated Peru as the country of deportation. The IJ also concluded that although deportation proceedings were not pending against the twins, they also were deportable because they entered the United States without inspection with Meza–Manay in 1987.

In support of her request for asylum, Meza–Manay testified that while in Peru, she expressed her opposition to the communist ideology of the terrorist group Sendero Luminoso ("Shining Path") to co-workers, friends, and neighbors. She also testified that she opposed the Shining Path's practice of murdering people who were not involved in politics. Even though Meza–Manay was not personally affiliated with any organizations that opposed the ideology of the Shining Path, she argues that the Shining Path imputed to her the political opinions of her husband, Issac Manay.

Issac Manay served as a member of the National Police of Peru from 1977 to 1989. In 1979, he joined the National Intelligence Service, which monitored and investigated terrorist activities perpetrated against the Peruvian government by the Shining Path. Issac Manay was responsible for the capture and incarceration of leaders of the Shining Path guerrillas.

In October 1981, a bomb planted in Issac Manay car exploded outside their home in Lima. The car and the first floor of the Manay home were destroyed by the blast. The upstairs windows and doors were damaged. At the time of the blast, Meza–Manay and her husband were on the second floor.[3] Fortunately, no one was injured in the explosion. Two hours after the explosion, Meza–Manay received a phone call from a repre-

---

1. Previously, Meza–Manay was convicted of several petty theft offenses. Believing that her criminal history would render her statutorily ineligible for withholding of deportation or voluntary departure, she withdrew her application for withholding of deportation during her immigration asylum hearing before the immigration judge ("IJ"). The IJ noted that "[t]he record reflects that the respondent may be suffering from some type of an impulse disorder such as kleptomania ... she is currently undergoing therapy for the problem."

2. Initially, Meza–Manay submitted applications for asylum and suspension of deportation pursuant to sections 208 and 244 of the INA. Subsequently, she withdrew her application for suspension of deportation and elected to proceed solely on her application for political asylum.

3. The record does not state where the twins were at the time of the explosion.

sentative of the Shining Path. The caller instructed her to "tell that dog of your husband that this time you were lucky. But next time both of you will not have the same luck." Two weeks before the bombing, Issac Manay had captured a squad and some Shining Path leaders.

Because of the bombing, Meza–Manay and her husband abandoned their home in Lima and moved in with his parents in the district of Rimac in Lima (approximately thirty minutes from their home). One month after they moved to Rimac, a passing vehicle shot at Issac Manay as he was exiting the house. Meza–Manay, her husband, and her sister-in-law dived to the floor, thereby avoiding the bullets.

After this second attack, Meza–Manay and her husband decided to leave the country. They agreed that she would travel alone to the United States and that her husband and infant twin sons would eventually join her. When she reached the United States, Meza–Manay advised her husband to postpone the journey until their sons were old enough to survive the difficult and dangerous trip. Meza–Manay's husband and children remained in Meza–Manay's in-laws' home in Rimac.[4]

For several years, Meza–Manay's husband and sons resided in Meza–Manay's in-laws' home without incident. In December of 1986, the Shining Path attempted to kidnap the twins. Shortly after the failed kidnapping, the Shining Path bombed Meza–Manay's in-laws' home. The explosion killed Meza–Manay's in-laws and seriously wounded her husband and some of his siblings. The twins were not in the house at the time of the bombing.

Concerned about the twins' safety, Meza–Manay returned to Peru. Meza–Manay and her husband agreed that the twins should leave the country. Her husband remained in Peru to support his twelve orphaned brothers and sisters. During her brief return to Peru, Meza–Manay's brother-in-law disappeared, presumably killed by the Shining Path guerrillas. Meza–Manay again entered

the United States without inspection on or about June 1, 1987, this time in the company of the twins.

In 1989, Issac Manay left his post with the National Police and moved to Ecuador. Meza–Manay did not join her husband. Rather, after several years of living apart, Meza–Manay commenced divorce proceedings.

On August 8, 1995, the IJ denied Meza–Manay's application for political asylum under sections 208(a) and 243(h) of the INA. On August 16, 1995, Meza–Manay filed a timely notice of appeal with the BIA. On October 17, 1996, the BIA affirmed the IJ and dismissed the appeal on the grounds that Meza–Manay had not established past persecution or a well-founded fear of future persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion. Meza–Manay now appeals the BIA's final decision denying her political asylum. She does not appeal the denial of withholding of deportation.

## II

### A. Standard of Review

■ We review the BIA's interpretations of law regarding the INA under the de novo standard. *See Arteaga v. INS*, 836 F.2d 1227, 1228 (9th Cir.1988). We review the BIA's factual findings under the deferential "substantial evidence" standard and will uphold them unless the evidence compels a contrary conclusion. *See Prasad v. INS*, 101 F.3d 614, 616 (9th Cir.1996); *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992).

The parties dispute whether Meza–Manay's eligibility for political asylum presents an issue of law or fact. Meza–Manay argues that, because there is no dispute as to the credibility of her testimony, the sole issue on appeal presents a question of law-whether she is eligible for asylum under the INA. *See Maldonado–Cruz v. Dept. of Immigration & Naturalization*, 883 F.2d 788, 791 (9th Cir.

4. Despite the heightened risk of leaving the children with their father and his family, Meza–Manay testified credibly that her parents, who

lived in a poor rural community, financially were unable to take her children in.

1989). On this basis, Meza–Manay contends that we should review the BIA's denial of asylum under the de novo standard. On the other hand, the INS argues that the BIA's decision to deny Meza–Manay's petition for asylum should be reviewed under the substantial evidence standard. We need not resolve this dispute because we find that, even if we review under the deferential "substantial evidence" standard, the BIA's decision determining that Meza–Manay is not eligible for asylum should be reversed. Because the BIA's decision denying Meza–Manay asylum is not supported by substantial evidence, we grant Meza–Manay's petition for review, reverse the BIA's decision denying Meza–Manay asylum, and remand this case to the BIA.

### B. Petitioner's Credibility

■ We have held that "[a]bsent an explicit finding that a specific statement by the petitioner is not credible, we are required to accept her testimony as true." *Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir.1994). Here, neither the IJ nor the BIA questioned Meza–Manay's credibility.[5] In resolving this appeal, we accept Meza–Manay's testimony as true.

### C. Eligibility for Asylum

■ To establish eligibility for asylum, an alien must show that he or she is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A). Refugee status is established by evidence of past persecution, or by evidence that the alien "has a 'well-founded fear of future persecution,' on account of race, religion, nationality, membership in a particular social group, or political opinion."

5. The IJ accepted Meza–Manay's testimony as credible: "In terms of corroboration for the incidents complained of they clearly are not inherently unworthy of belief given the terrorist activities of the Shining Path guerrillas in Peru particularly during the 1980s."

6. Meza-Manay also testified that the ideologies and tactics of the Shining Path were against her principles. The INS argues that despite this assertion, Meza–Manay's lack of a political opinion is apparent in the following exchange between her and her attorney:

Q. And were you against this?

*Singh v. Ilchert*, 63 F.3d 1501, 1505 (9th Cir.1995). "Eligibility for asylum may be based on past persecution alone." *Id.* at 1505–1506 (citing *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir.1993)). The determination whether an alien has a "well-founded fear of persecution" turns on subjective and objective components. *See id.* at 1506. The former component is satisfied if the fear is genuine. *See id.* at 1504 (citations omitted). The objective component requires a showing "by credible, direct, and specific evidence in the record, that persecution is a reasonable possibility." *Id.* at 1506 (internal citations and quotations omitted). The objective component may be satisfied "by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." *Id.* (quoting *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir.1988)).

### D. Persecution on Account of Political Opinion

■ On appeal, Meza–Manay argues that the BIA erred in finding that as a matter of law she was not persecuted in the past on account of an actual or imputed political opinion. We agree.

In support of her petition for political asylum, Meza–Manay testified credibly that she opposed the Shining Path because of its "communist principles" and the violence and death that they inflicted on innocent people in furtherance of those ideologies.[6] We have held that in certain circumstances an asylum petitioner may hold a political opinion within the meaning of the INA even if the petitioner did not participate in organized political activities. *See Lazo–Majano v. INS*, 813 F.2d 1432, 1435 (9th Cir.1987) (finding that a belief

A. Yes.

Q. And why was that?

A. Because that was against my principles.

Q. What principles are those?

A. Because I wish—I didn't understand your question.

Unfortunately, the question was not clarified and Meza–Manay was not given another opportunity to set forth her political views. While further elaboration would have provided greater insight on Meza–Manay's motivations, the record clearly reflects that she was openly opposed to the ideologies and tactics of the Shining Path.

that "the Armed Force [was] responsible for lawlessness, rape, torture and murder," constituted a political opinion, even though the woman who held that belief did not participate in politics), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955, 963 (9th Cir.1996). Here, as in *Lazo–Majano*, Meza–Manay's political opinion exposed her to persecution.

In any event, even if Meza–Manay held no personal political beliefs against the Shining Path, she is still eligible for asylum because the Shining Path persecuted her on account of a political opinion imputed to her. *See Singh*, 63 F.3d at 1508–1509 (finding that persecution resulting from erroneously imputed political opinion provides a valid basis for asylum in the United States); *Canas–Segovia v. INS*, 970 F.2d 599, 601 (9th Cir. 1992) (finding that imputed political opinion is a valid basis for granting asylum); *Matter of S–P–*, Interim Decision 3287 (BIA 1996) (finding that "persecution for 'imputed' grounds ... can satisfy the 'refugee' definition"); *Sangha v. INS*, 103 F.3d 1482, 1488 (9th Cir.1997) (finding that "[t]he third way an applicant can establish a 'political opinion' under the Act is to show an imputed political opinion[, which] ... is a political opinion attributed to the applicant by his persecutors").

Meza-Manay contends that she was persecuted in Peru because of her own political beliefs and because of her husband's involvement with the Peruvian Police Force's counter-insurgency unit. Meza–Manay credibly testified that her friends, co-workers, and neighbors nicknamed her "ear," which means spy in Spanish [7] because of her open opposition to the Shining Path and her husband's role in capturing guerrilla leaders.

Meza-Manay argues that a reasonable person in her circumstances would have feared persecution at the hands of the Shining Path. We agree.

The attacks on Meza–Manay's husband, herself, their children, and her husband's family compel the reasonable inference that Meza–Manay was perceived to be a political opponent of the Shining Path. *See Lazo–Majano*, 813 F.2d at 1435 (granting asylum on evidence that petitioner was considered a subversive because of her husband's affiliation with a paramilitary group). On two separate occasions the Shining Path attempted to kill Meza–Manay. First, while she and her husband were at home, a bomb planted in her husband's car destroyed the first floor of their home. Meza–Manay herself was threatened that "next time *both* of you will not have the same luck." *See, e.g. Arteaga*, 836 F.2d at 1232 (holding that a one-time threat with no physical violence amounted to a specific threat of persecution); *Aguilera–Cota v. INS*, 914 F.2d 1375 (9th Cir.1990) (holding that an anonymous note and a visit by a stranger gave petitioner a well-founded fear of persecution).

Second, the record also shows that the Shining Path thought it insufficient just to kill Issac Manay-instead they viewed all his relatives, including Meza–Manay, as targets. Someone in a passing vehicle fired on Meza–Manay, her sister-in-law, and her husband. Shortly thereafter, Meza–Manay fled to the United States. During Meza–Manay's absence from Peru, the Shining Path attempted to kidnap her children; bombed her in-laws' home, killing them and seriously wounding her husband and his siblings; and abducted and killed her husband's brother. The record shows that the guerrillas made no attempt on Issac Manay's life outside the company of his family. As this court has stated,

> In deciding whether anyone has a well-founded fear of persecution or is in danger of losing life or liberty because of a political opinion, one must continue to look at the person from the perspective of the persecutor. If the persecutor thinks the person guilty of political opinion, then the person is at risk.

*Lazo-Majano*, 813 F.2d at 1435. Here, Meza–Manay has demonstrated that she was an intended target of the Shining Path. *Cf. Sangha*, 103 F.3d at 1490 (finding no evi-

---

7. The Spanish word "oreja" translates literally into English as "ear." The term "oreja," however, is also used to identify someone as a spy. *See Matter of A–G–*, 19 I. & N. Dec. 502, 503, 1987 WL 108955 (BIA 1987) (finding that "the respondent himself was recruited by a friend to be an oreja, or spy, for the government").

dence that petitioner's father's political opinion was imputed to him where the BTF sought *"only* Sangha's [petitioner's] father and beat up *only* Sangha's father.... The fact that the BTF *ignored* Sangha suggests that it did not believe that Sangha held his father's views") (emphasis added). The record reflects that those who threatened and attempted to kill Meza–Manay were motivated, in part, by a belief that her political views were antithetical to those of the Shining Path. Having demonstrated a well-founded fear of persecution because of an actual and imputed political opinion, Meza–Manay is eligible for asylum. *See Matter of Chen*, 20 I. & N. Dec. 16, 18 (BIA 1989) ("If an alien establishes that [s]he has been persecuted in the past for one of the five reasons listed in the statute, [s]he is eligible for a grant of asylum."); *Desir*, 840 F.2d at 729 ("[P]ast persecution, without more, satisfies the requirement of § 101(a)(42)(A), even independent of establishing a well-founded fear of future persecution.").

The evidence clearly shows that the Shining Path's threats and attempts to kill Meza–Manay, her children, and her husband's family were in retaliation for her husband's efforts to eliminate the leadership of the Shining Path.

### E.  Presumption

█  An alien who establishes past persecution is presumed to have a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i); *Prasad*, 101 F.3d at 617. This presumption may be overcome by evidence that "since the time the [past] persecution occurred conditions in [the country of petitioner's nationality] have changed to such an extent that [petitioner] no longer has a well-founded fear of being persecuted if [s]he were to return." *Prasad*, 101 F.3d at 617 (citations and quotations omitted).

█  Meza-Manay was entitled to the benefit of the rebuttable presumption of a well-founded fear of future persecution be-

cause, as shown above, a reasonable factfinder would have to conclude that she suffered past persecution on account of actual or imputed political opinion. But the BIA made no finding that the INS had rebutted this presumption through evidence of changed country conditions. Rather, the BIA thought that because Meza–Manay "was no longer married to her ex-husband, who is no longer a member of the police force and no longer lives in Peru," she had "not demonstrated that if she were to return to Peru, she would continue to be attributed the political beliefs of her husband and targeted for that reason."

The BIA is incorrect on three grounds. First, Meza–Manay was personally targeted for her own political beliefs. Second, the BIA's reasoning that future persecution is unlikely given that petitioner's soon-to-be ex-husband no longer works for the National Police Force of Peru rests on faulty assumptions. The BIA assumes that the divorce will be finalized and that the Shining Path will be informed about the divorce. More importantly, the BIA assumes that the Shining Path will no longer perceive Meza–Manay, ex-wife of Issac Manay, as a political enemy. Meza–Manay's divorce, when finalized, would not alter her own political opinions or her alleged status as a spy for the Peruvian government. Thus, we disagree with the BIA's reasoning that Issac Manay's flight from Peru to Ecuador shields Meza–Manay from the Shining Path should she be forced to return to Peru. The U.S. State Department considers the Peruvian government's success at reducing the terrorist threat of the guerrilla forces "a result of the government's continuing success in detaining Shining Path leaders." United States Department of State, Bureau of Democracy, Human Rights and Labor, *Peru–Profile of Asylum Claims & Country Conditions* (April 1995).[8] Issac Manay, as a member of an elite Peruvian police unit, was directly responsible for capturing leaders of the Shining Path. In Issac Manay's absence, Meza–Manay, as the mother of Issac Manay's children, would remain a

---

8.  The State Department Report states that while "[t]he conflict between the government and the main internal terrorist group, the Shining Path (Sendero Luminoso), slowed noticeably in 1993," after the arrest of several Shining Path leaders,

including Abimael Guzman, the founder, leader, and chief strategist for the Shining Path, "[b]y late 1994 ... the guerrilla/terrorist conflict continued." *Id.*

natural target for a vengeful Shining Path. Third, 8 C.F.R. § 208.13(b)(1)(i) places on the INS (not the petitioner) the burden of, proving by a preponderance of the evidence, changed country conditions. This burden is not satisfied by merely pointing to changes in the petitioner's personal life.[9]

### III

Meza-Manay's petition for review is granted. The BIA's decision determining that Meza–Manay is not eligible for asylum is reversed. We remand this case to the BIA to exercise its discretion to grant petitioner Meza–Manay asylum. Because Meza–Manay did not challenge the BIA's decision regarding denial of her claim for withholding of deportation, we do not address the merits of that claim.

PETITION GRANTED, REVERSED AND REMANDED.

Randall E. Strauss, Strauss, Neibauer, Anderson & Ramirez, Modesto, California, for plaintiff-appellee.

Daniel P. Trump, Trump, Alioto, Trump & Prescott, San Francisco, California, for defendant-appellant.

9. The Code of Federal Regulations governing the Immigration and Naturalization Service states specifically that:
   If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution *unless* a preponderance of the evidence establishes that since the time the persecution occurred *conditions in the applicant's country of nationality or last habitual residence have changed* to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.
   8 C.F.R. § 208.13(b)(1)(i) (emphasis added).

