Mesrop **MARTIROSYAN**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 98–70979.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 2000.

Filed Oct. 23, 2000.

As Amended Nov. 6, 2000.

Louis A. Gordon, D. Jade Mundel, Los Angeles, California, for the petitioner-appellant.

Robbin K. Blaya, Office of Immigration Litigation, Civil Division, Department of Justice, Washington, D.C., for the respondent-appellee.

Before: WALLACE, PREGERSON, and THOMAS, Circuit Judges.

Opinion by Judge PREGERSON; Dissent by Judge WALLACE.

PREGERSON, Circuit Judge:

Mesrop Martirosyan, a native and citizen of Armenia, petitions for review of the Board of Immigration Appeals' ("BIA's") decision to adopt and affirm the Immigration Judge's ("IJ's") denial of his request for asylum and withholding of deportation. The IJ found that Martirosyan failed to establish a well-founded fear of persecution on account of a protected ground. Martirosyan asserts that, under our holding in *Barraza Rivera v. INS*, 913 F.2d 1443 (9th Cir.1990), he has a well-founded fear of persecution in Armenia on account of his political opinion as a conscientious objector. Martirosyan fled the country after refusing to serve in the Armenian military at a prisoner-of-war ("POW") camp where he would have been forced to perpetrate inhuman acts against POWs. Despite finding Martirosyan credible, the IJ (and the BIA) dismissed his claim as "speculative." On appeal, Martirosyan argues that the IJ and BIA erred in so ruling. We agree.

Martirosyan also argues on appeal that the BIA violated his due process rights by failing to examine adequately the documentary evidence that he presented in support of his request. It is unclear from the record whether the BIA considered Martirosyan's documentary evidence in denying his application. Nevertheless, because we hold that Martirosyan is eligible for asylum and withholding of deportation, remand to ensure the fundamental fairness of the proceedings is unnecessary.

Accordingly, we grant the petition, vacate the BIA order, and remand for further proceedings.

## I.

Petitioner Mesrop Martirosyan trained to be a soldier in the Soviet Army. In 1984 at the age of seventeen, he began his military education at the Higher Political All Army School in Minsk, Belorussia, one of Soviet Union's most well-respected military academies. Because membership in the Communist Party was required to enroll in this Academy, Martirosyan became a communist and agreed to "propagandize for the Communist Party." But he thought of himself as a dissident, having listened to the Voice of America and read forbidden Western literature when he was a child.

Martirosyan graduated from the Academy as a lieutenant in June 1988, around the time of the Soviet withdrawal from Afghanistan. He was immediately sent to Kazakhstan, as a part of a special political unit in the Soviet Army. He spent two years in Kazakhstan, serving in a position he described as a "counselor" or "chaplain." His job was "to sell Communism" to Soviet soldiers returning from the "conflict" in Afghanistan. Martirosyan had to "retrain" them in the ordered ways of the Communist party and boost their morale in the process. Each soldier had to be "retrained" for six months before he could be sent home. As a result of his work, Martirosyan became deeply disillusioned with the Soviet Army and its treatment of returning soldiers in particular. Martirosyan believed that the "retraining" amounted to little more than isolation. He began to express his anti-communist views openly. He also "had numerous arguments with other officers against the rulings, laws and regulations" imposed by the communists on the Army. As a result in 1989, his commanding officer gave him an unfavorable "political" report. The 1989 report stated that Martirosyan "has looseness in his ideological structure."

After the 1989 report, Martirosyan's superiors considered him "untrustable." As a result, he was transferred from his "very good assignment" near the front counseling soldiers returning from war to various assignments counseling non-uniformed soldiers engaged in the "blue collar work" of disarmament. Martirosyan described these assignments as a kind of "exile" because they had nothing to do with "military activity." During this time Martirosyan continued to express his anti-communist beliefs. In June 1990, he was sent home for a mandatory vacation of forty-five days. Upon his return, he was "fired" from the Soviet Army because of his ideological conflict with the Communist regime.

In July 1990, after being fired from the army, Martirosyan returned to Armenia. From 1990 to 1992, he worked for a private insurance company. He then began taking English classes at the American University of Armenia. While there, he and other young officers formed a group called "Officers Against the War" ("OAW"). The members of this group understood "[t]he meaning of officers [as] men, defenders, protectors, not as killing persons." The OAW were against the ill treatment of any prisoner of war and, in particular, the torture of Azeri prisoners taking place in the POW camps in Nagorno–Karabakh at the hands of the Armenian Army. Nagorno–Karabakh is a predominantly Armenian region of Azerbaijan. The Russians and the Armenian Army were at war with the Azeris over the

reunification of Nagorno–Karabakh with the Republic of Armenia. Martirosyan and his fellow officers in the OAW were disgusted by the atrocities occurring on both sides of the war.

Martirosyan testified that he had seen with his own eyes POWs who had been tortured or had body parts cut off at the POW camps. "I have seen persons whose ears were cut off ... I have seen children playing with the ears." Martirosyan also testified that his brother-in-law, a pilot who delivered supplies daily to Nagorno–Karabakh, told him of the brutalities and atrocities he had also seen firsthand. And Martirosyan testified to the numerous television and newspapers reports he had seen and read in both Armenia and Nagorno–Karabakh that recounted the atrocities occurring on both sides of the war.

In early 1991, Martirosyan decided to join voluntarily the "Self–Defense Forces" of Nagorno–Karabakh. This group was a militia of sorts that evolved into the Armenian National Army. But Martirosyan changed his mind when he learned that the militia would "dispatch [him] only to the prisoner's camp according[ ] to [his] specialism" as a Soviet-trained officer with a background in Communist "retraining."

Two years later, service in the Armenian Army became mandatory, and Martirosyan was conscripted. In December 1993, three uniformed military deputies came to Martirosyan's home and "declared that [he] was a traitor of Pan Armenian ideals and if [he] refused to go to war then [he] would destroy [his] family and sentence them to starvation." They also threatened him that if he did not join the Army, he would be imprisoned, "or they would do something and nobody would hear about it."

Martirosyan testified that "the National Armenia[n] Army wanted only to send me to the war prisoners.... They told me you either go to the camp of the prisoners or nowhere else." He was not willing to do that. He testified, "I am a soldier, I am not an executioner. All those stories which I heard about brutalities I couldn't

be one of them." He testified that if the Army was willing to let him fight in the war, instead of sending to him the camps, he "would have joined the army" gladly. But the "commissariat"—an Army official—insisted that he serve in the POW camps.

After Martirosyan refused to serve at the army's POW camps, his family began receiving daily threats from the military. They were denied any government subsidy or assistance, which his father, a deaf mute, apparently depended on. Martirosyan himself was "not allowed to work or have sources of income." It became "impossible" for him to "live and exist in Armenia." So in January 1994 he fled to Russia.

A year later, Martirosyan's family was still persecuted for his refusal to serve at the army's POW camps. In April 1995, the Armenian military police seized his younger brother and held him captive for two weeks. The police interrogated him about Martirosyan's whereabouts and "physically forced [his brother] to call" Martirosyan in Moscow to try to convince him to submit to the Armenian Army's demands. His brother escaped and fled to Poland, where he has since remained.

Shortly thereafter, the former Soviet Republics signed an agreement that required all draft evaders to be taken into custody and returned to their home countries for prosecution and imprisonment of up to seven years. Fearing that he would be jailed or sent back to Armenia if he stayed in Russia, Martirosyan secretly returned to Armenia for one day to get a passport and business visa to the U.S. Martirosyan entered the United States in June 1995 and overstayed his visa.

In support of his application, Martirosyan introduced a variety of documents. In addition to his Soviet Army records, the documentation included Amnesty International's October 1995, Report, *Armenia, Comments on the Initial Report Submitted to the United Nations Committee*

*Against Torture;* May 25, 1995, Media Advisory, *Armenia: Death in Custody Heightens Fears About Treatment of Political Detainees; Hostages, Prisoners of War, and Other Captives,* from Human Rights Watch's book, SEVEN YEARS OF CONFLICT IN NAGORNO–KARABAKH; a 1995 Armenian News Service release; and miscellaneous 1995 Amnesty International Press Releases reporting on the murder of Azeri political prisoners of war held in Armenia.

The record also contains the United States State Department Bureau of Democracy, Human Rights and Labor's report entitled *Armenia—Profile of Asylum Claims and Country Conditions* (May 1996) (the "Report"). The State Department provided the Report to INS, which the IJ incorporated into the administrative record as an exhibit pursuant to 8 C.F.R. § 208.11(d). Moreover, the Report incorporated by reference other State Department publications, including the *Country Reports on Human Rights Practices* ("the Country Reports"), which are prepared by country and updated annually. The Report specifically advises immigration "adjudicators" to consult the applicable *Country Report* "to provide context for [the Report's] comments ... [and] provide additional and current information relevant to the specific standards set forth in the INA."

Martirosyan applied for asylum and withholding of deportation, with an alternative request for voluntary departure. In an oral decision, the IJ found Martirosyan credible, denied his application for asylum and withholding of deportation, and granted his request for voluntary departure,

designating Armenia as the country of deportation. Despite finding Martirosyan credible, that his written application was consistent with his testimony, and that his testimony was corroborated by the documentary evidence, the IJ found Martirosyan's claim that he would be required to commit inhuman acts at POW camps "speculative." On this basis, the IJ ruled that Martirosyan's claim is distinguishable from that of the petitioner in *Barraza Rivera v. INS,* 913 F.2d 1443 (9th Cir. 1990). The BIA affirmed and adopted the reasoning of the IJ, adding only that Martirosyan only "assumed" that he would be forced to participate in any kind of torture or ill-treatment of prisoners. Martirosyan timely petitioned for review of the BIA's decision.[1] We have jurisdiction under 8 U.S.C. § 1105a.[2]

## II.

We review the BIA's factual findings underlying its decision to deny asylum and withholding of deportation under the substantial evidence standard. *See Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998). Where, as here, the BIA clearly adopts and incorporates the IJ's reasoning, we review the IJ's decision. *See Lopez–Reyes v. INS,* 79 F.3d 908, 911 (9th Cir.1996). "[I]f 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,'" the BIA's decision can be reversed only if the applicant shows "that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (quoting 8 U.S.C.

---

1. Martirosyan also filed a Motion for a Stay of Deportation pending review of his separate Motions to Reconsider and to Reopen, filed August 26 and October 23, 1998, respectively. This court granted the Motion to Stay Deportation on October 15, 1998.

2. Because Martirosyan's deportation proceedings began before April 1, 1997, and his final deportation order was issued after October 31, 1996, his petition for review is governed

by the Illegal Immigration Reform and Immigrant Responsibility Act's ("IIRIRA's") transitional rules. *See Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997). Martirosyan filed his petition for review within the thirty-day filing period set by IIRIRA 309(c)(4)(C). We therefore have jurisdiction to review his petition under 8 U.S.C. § 1105a(a), as amended by IIRIRA § 309(c).

§ 1105a(a)(4). If, however, "the issues presented [on] appeal involve the application of established legal principals to undisputed facts, [this court's] review of the BIA's asylum and withholding of deportation determinations is de novo." *Singh v. Ilchert*, 63 F.3d 1501, 1506 (9th Cir.1995).

### A. Martirosyan's Claims of a Well–Founded Fear of Persecution

 Under 8 U.S.C. § 1158, the Attorney General has discretion to grant asylum to aliens who qualify as "refugees" within the meaning of section 101(a)(42)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42)(A). A "refugee" is defined as a person who is unwilling or unable to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Establishing a well-founded fear of persecution sufficient to qualify for asylum requires a 'subjectively genuine' and 'objectively reasonable' fear of persecution." *Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir.1998) (quoting *Arriaga–Barrientos v. INS*, 937 F.2d 411, 413 (9th Cir.1991)). The objective component requires a showing by "credible, direct, and specific evidence in the record that persecution is a reasonable possibility." *Meza–Manay v. INS*, 139 F.3d 759, 763 (9th Cir.1998). Proof that there is a "one in ten chance" of persecution if returned to his or her native country is sufficient to qualify for asylum. *Id.* at 1310 (quoting *Montecino v. INS.*, 915 F.2d 518, 520 (9th Cir.1990)).

 In addition, where there is a "clear probability of persecution" if the applicant is forced to return to his or her home country, "the Attorney General must withhold deportation." *Maini v. INS*, 212 F.3d 1167, 1173 (9th Cir.2000). To qualify for the mandatory relief of withholding

deportation, the applicant must show that it is "more likely than not" that his or her "life or freedom would be threatened on account of" a protected ground if he or she were deported. *Id.* at 1174 (citing 8 C.F.R. § 208.16(b)). Thus, "[a]n alien must satisfy a more stringent standard for withholding deportation than for asylum." *Id.* at 1173; *see also Velarde*, 140 F.3d at 1309 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

 Martirosyan asserts that he has a well-founded fear of persecution as a conscientious objector. Generally speaking, compulsory military service or *prosecution* for desertion does not constitute *persecution* within the meaning of the INA. *See id.* at 1450; *see also Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812 (holding that "a guerrilla organization's attempt to coerce a person into performing military service does not necessarily constitute 'persecution on account of . . . political opinion'"). But "conscientious objection to military service" is a valid ground for relief from deportation where compulsory military service would require the alien "to engage in inhuman conduct." *Ramos–Vasquez v. INS*, 57 F.3d 857, 864 (9th Cir.1995). Indeed, the BIA recognizes conscientious objector status as an exception to the general rule that forced recruitment into the military is not persecution in "'those rare cases . . . where the alien would necessarily be required to engage in inhuman conduct as a result of military service required by the government.'" *Barraza Rivera*, 913 F.2d at 1451 (quoting *In re A–G–*, 19 Interim Dec. ("I & N Dec.") 3040 (BIA 1987), *aff'd sub nom. M.A. v. United States INS*, 899 F.2d 304, 312 (4th Cir.1990) (en banc)); *see also Gomez–Mejia v. INS*, 56 F.3d 700, 703 & n. 1 (5th Cir.1995) (recognizing the conscientious objector status exception in certain circumstances).[3]

---

**3.** Despite the dissent's contrary belief, our 1995 decision in *Ramos–Vasquez* reaffirmed the conscientious objector exception three years *after* the Supreme Court's 1992 decision

In *Barraza Rivera*, we explicitly held that punishment based on objection to participation in inhuman acts as part of forced military service is 'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A). *Id.* at 1453–54 (citing, *inter alia*, Office of the United Nations Commissioner for Refugees' Handbook on Procedures and Criteria for Determining Refugee Status, at (1979)). Thus,

> [i]f a soldier deserts in order to avoid participating in acts condemned by the international community as contrary to the basic rules of human conduct, and is reasonably likely to face persecution should he return to his native country, his desertion may be said to constitute grounds for asylum based on political opinion.

*Ramos–Vasquez*, 57 F.3d at 864.

Here, the IJ found Martirosyan's fear of persecution as a conscientious objector "speculative" and denied his requests for relief from deportation on this basis. We hold that the IJ's finding is not "supported by reasonable, substantial, and probative evidence on the record as whole," and is therefore untenable. *Elias–Zacarias*, 502 U.S. at 480, 112 S.Ct. 812. There is no evidence in the record that refutes any of Martirosyan's testimony. To the contrary, the record contains ample testimonial and documentary evidence that would compel a reasonable fact finder to conclude that Martirosyan's fear of persecution is well-founded and based on a more than "reasonable possibility" that it "would occur if he was returned to" Armenia. *Barraza Rivera*, 913 F.2d at 1452.

### 1. Martirosyan's Subjective Fear of Persecution

Here, it is undisputed that Martirosyan's fear of persecution is "subjectively genuine." He established this component by "credibly testifying that [he] fears persecution" if returned to Armenia. *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir.1999). Indeed, the IJ expressly found him credible, and the BIA made no contrary finding. Under such circumstances, we must "accept the testimony given before the IJ as undisputed," *id.* at 1033, and presume it to be true, *see Briones v. INS*, 175 F.3d 727, 730 (9th Cir.1999) (en banc).

### 2. Martirosyan's Objective Fear of Persecution

Martirosyan's "credible, direct, and specific" testimony establishes more than a "reasonable possibility" that Martirosyan's mandatory military service would require him to engage in the inhuman treatment of POWs under orders from the Armenian military. *Meza–Manay*, 139 F.3d at 763. Moreover, Martirosyan corroborated his testimony with multiple articles and press releases issued by Amnesty International and the Human Rights Watch. As the IJ acknowledged, these articles detailed the "egregious violations of the rules of war" committed by the armies of Armenia, the Republic of Azerbaijan and the "self-proclaimed Republic of Nagorno–Karabakh." The atrocities "included forced displacement, looting and burning of homes, hostage taking and holding, mistreatment and summary execution of prisoners of war and indiscriminate use of air power against the civilian targets." According to Human Rights

in *Elias–Zacarias*. The conscientious objector exception is not at odds with the decision in *Elias–Zacarias*. To the contrary, the exception is in harmony with the statement in *Elias–Zacarias* that forced recruitment into the military *without more* does not necessarily constitute persecution on account of political opinion.

Here, Martirosyan did not simply "desire to avoid military service," as the dissent incorrectly suggests. If that were the case, we

would agree with the dissent that he would not be eligible for political asylum under *Elias–Zacarias*. Instead, Martirosyan fled forced military recruitment that would necessarily require him to engage in the inhuman treatment of POWs at the Armenian Army's POW camps. Under *Barraza Rivera* and *Ramos–Vasquez*, that additional fact qualifies him for political asylum and distinguishes his case from that in *Elias–Zacarias*.

Watch, between 1993 and 1994, "Karabakh Armenian forces with the support of the Republic of Armenia were responsible for the majority of abuses during that period."

Even the State' Department's Report and the Armenian Country Report, which was incorporated into the record by reference, add support to Martirosyan's testimony. The State Department · Report stated that: "Major violations of human rights occurred in connection" with the expulsion of Azeris from the Nagorno–Karabakh region of Azerbaijan. The Armenia Country Report, entitled *Armenia Human Rights Practices 1994* (published in February 1995) stated that:

> there were several instances of police brutality toward detainees, many instances of forcible conscription of draft-age men, and suspected executions of Azerbaijani prisoners of war.
>
> . . . . .
>
> Representatives of independent international agencies maintain that many would-be prisoners of war on both sides in the Nagorno–Karabakh conflict are summarily executed. . . .
>
> . . . . .
>
> Information on prison conditions is not available, but they are believed to be harsh. The International Committee of the Red Cross had access to prisoners of war from the Nagorno–Karabakh conflict until October.
>
> . . . . .
>
> There were many instances of interference with privacy during waves of army conscription in 1994. Military recruiters appeared at houses where draft-age men

were reported to live and often threatened or detained the occupants or inflicted material damage. They seized draft-age men in public places, such as markets, theaters, and the subway. There are credible reports that Armenian and Nagorno–Karabakh officials forcibly conscripted refugees from Nagorno–Karabakh and Azerbaijan.

The March 1996 update of the State Department report on *Armenia's Human Rights Practices, 1995,* draws a similar picture of the inhuman treatment of prisoners of war by Armenia:

> The Government has not improved the prison system, which still uses Soviet-era "Kartser," which are outdoor, cement cells where prisoners are often incarcerated for weeks at a time, receiving food once every 3 days.
>
> The Government has not facilitated independent monitoring of prison conditions. It has denied requests by foreign embassy officials, the International Committee of the Red Cross (ICRC), and others to conduct unescorted visits with detainees. . . .

Despite this corroborating documentary evidence, the consistency between Martirosyan's credible testimony and application, and the lack of any contrary evidence in the record, the IJ concluded that Martirosyan "merely speculates that if he were drafted into the army he would be sent to a prisoner of war camp and if all that happened, he would be required to mistreat prisoners of war." It appears, however, that the IJ here, like the IJ we reversed in *Ramos–Vasquez,* found Martirosyan's claim "incredible simply because [she did] not wish to believe him."[4] 57 F.3d at 861. Such a ruling "is not based

---

4. Indeed, throughout the hearing, the IJ appears to have been somewhat patronizing and argumentative toward Martirosyan. The following exchange typifies the IJ's argumentative attitude toward Martirosyan. When Martirosyan testified that the Soviet Army "dismissed" or "fired" him because of his anti-Soviet attitude, the IJ responded:

IJ: What do you mean by dismissed, sir, court-martial, resign, term of service expired?

M: By the order of the Ministry of Defense, they just fired me.

IJ: Ok, well, sir, let me share with you my background. I am in the U.S. Army, right now a National Guardsman with the California National Guard. I was on active duty with that Army and so I

on substantial evidence of record," and therefore "must be rejected." *Id.; see also Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996) (stating that "conjecture is not a substitute for substantial evidence").

The following exchange illustrates the improper basis upon which the IJ rejected Martirosyan's claim: Martirosyan testified that "it was impossible for him" to participate in the inhuman treatment of POWs. He said that such treatment included severing ears and holding the mothers of POWs hostage while the Armenian Army sent their sons into Azerbaijan to commit terrorist acts on citizens. In response, the IJ stated:

"Well, sir, I don't frankly believe you that the military commissioner said he

> have some knowledge of military things. But what I don't understand is the Soviet Army and I don't understand the Armenian Army. But I can tell you in the American Army, people just don't get dismissed like that, there is usually some sort of process they go through. Either administrative or a disciplinary process. Is it different in the Russian Army?
>
> M: According to the laws of the Soviet Union from the Army, a person can be—an officer can be fired, but the order of the officer that admitted him or by the Ministry of Defense.
>
> IJ: What did they say, were there papers that reflected this firing? Written documents?
>
> M: No.
>
> IJ: So they just called you in one day and said you're fired?
>
> Similarly, when Martirosyan testified to his disillusionment with the Soviet Army's treatment of soldiers returning from Afghanistan, his belief that the "retraining" programs were useless and that the Army should have let the soldiers return to their homes immediately, the IJ said:
>
> IJ: Well if I understand what you've complained about, it was that you thought it was a waste of your time and the army's time to keep these soldiers for six months when all they could do was be sent home since the fighting was over. . . . Okay so you were disillusioned that you had to waste your time with all the scraggly old people coming out of Afghanistan. . . .

5. The dissent's argument that we should deny Martirosyan's petition because "[n]ot one of

wanted you to cut off ears and blackmail people with their money . . . so I want you to show me the documents that you've submitted which are somewhat numerous where that happens, what you've just said happens. Do you have any documents recording that? About people getting blackmailed to do terrorist acts? Cutting off ears of the prisoners, what you said, do you?

 This court has repeatedly ruled that documentary evidence is not required to corroborate an asylum claim. *See Lopez–Reyes,* 79 F.3d at 912.[5] It is patently absurd to expect an applicant like Martirosyan to produce the documentary evidence demanded by the IJ in this case "[b]ecause 'persecutors are hardly likely to

the documents in the record contains even a single allegation of soldiers being forced to commit an atrocity" reflects an unwillingness to accept this well-established rule of law. The dissent also ignores the evidence to the contrary quoted *supra* from the March 1996 update to the State Department's Report on *Armenia's Human Rights Practices, 1995,* the State Department's Armenia Country Report entitled *Armenia Human Rights Practices 1994,* as well as the many articles and press reports issued by Amnesty International and the Human Rights Watch contained in the record. To use the language of the dissent, it "strains credulity" to believe that the "summary executions of prisoners of war" are committed by anyone *other than* soldiers assigned to POW camps.

Moreover, as we recently explained in *Zahedi v. INS,* 222 F.3d 1157 (9th Cir.2000), while "[t]hese materials . . . cannot establish [a petitioner's] claim independently," such documentary evidence may "help [the petitioner] establish the objective basis for his claim by placing his testimony into context." *Id.* at 1163 (granting the petition and finding the petitioner eligible for asylum and entitled to withholding of deportation). Indeed, " 'the purpose of country conditions evidence . . . is not to corroborate specific acts of persecution (which can rarely be corroborated through documentation), but to provide information about the context in which the alleged persecution took place, in order that the factfinder may intelligently evaluate the petitioner's credibility." *Id.* (quoting *Duarte de Guinac v. INS,* 179 F.3d 1156, 1162 (9th Cir.1999)).

provide their victims with affidavits attesting to their acts of persecution.' " *Ramos–Vasquez,* 57 F.3d at 862–63 (quoting *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984)). For this reason, "an alien's own testimony, if unrefuted and credible, is . . . sufficient [to grant asylum and] for withholding of deportation." *Id.* In *Barraza Rivera,* the petitioner's claim to conscientious objection status "rest[ed] in large part on his own testimony." 913 F.2d at 1449. Nevertheless, because his testimony was "[c]redible and persuasive," we deemed it sufficient to "establish eligibility for political asylum and withholding of deportation." *Id.* (citing *Cardoza–Fonseca v. INS,* 767 F.2d 1448, 1453 (9th Cir.1985), *aff'd,* 480 U.S. at 421, 107 S.Ct. 1207).

Key to the IJ's decision to reject Martirosyan's claim is her attempt to distinguish his case from that of the petitioner in *Barraza Rivera.* In *Barraza Rivera,* the petitioner abandoned military service and fled from El Salvador after he was ordered by a military officer, under the threat of death, to participate in the paid killing of two men. *See* 913 F.2d at 1450. The IJ here noted that Barraza Rivera "had actually been placed in a situation where he was going to be required to violate the laws of war and perform inhumane acts outside the ordinary course of war," whereas Martirosyan was not. It is true that Martirosyan was never directly asked to "cut the ear off" a POW or otherwise torture a POW. But he did present credible, specific, and unrefuted evidence that he was conscripted into military service, that he would be sent to the Army's POW camps, and that POWs are systematically treated inhumanely at the camps.

Indeed, there is no evidence in the record—let alone substantial evidence—casting any doubt that Martirosyan's case is one of "those rare cases" where mandatory military service " 'would necessarily . . . require[ ][him] to engage in inhuman conduct' " of POWs. *Barraza Rivera,* 913 F.2d at 1451 (quoting *In re A–G–,* 19 I & N Dec. 3040).[6] Given the compelling evidence supporting Martirosyan's claim to conscientious objector status, it makes little sense for this court to hold that relief from deportation should be denied simply because he fled Armenia before being given the direct order to torture or execute an Azeri POW. We therefore conclude that Martirosyan has demonstrated a well-founded fear of persecution as a conscientious objector and is eligible for political asylum and withholding of deportation on that basis.

## B. Martirosyan's Alleged Due Process Violation

Martirosyan claims that the BIA violated his due process rights by failing to mention, let alone examine, the documentation in the record that supports his application. We recently held that "an alien attempting to establish that the Board violated his right to due process by failing to consider relevant [documentary] evidence must overcome the presumption that [the Board] did review the evidence." *Larita–Martinez v. INS,* 220 F.3d 1092, 1095 (9th Cir.2000); *cf. Zahedi,* 222 F.3d 1157, 1165 n. 8 (holding *Larita–Martinez* inapplicable because Zahedi had not challenged the BIA's decision on due process grounds and because "Zahedi introduced evidence aimed at making out the objective element

---

6. The dissent dismisses Martirosyan's plea for asylum as an attempt "to avoid . . . another unglamourous posting." Dissent at 916. In support, the dissent cites Martirosyan's admission that he did not object to killing people as a soldier in battle, but "didn't want to be at a prisoner of war camp and deal with them." The dissent's willingness to disparage Martirosyan on this basis as a mere draft dodger is not only unfortunate, it shows an unwillingness to acknowledge the distinction recognized in *Barraza Rivera* between "forced recruitment" into *general* military service and "forced recruitment" into a *specific* military "position that requires [conscriptees] to betray their conscience by engaging in inhuman conduct." 913 F.2d at 1451. This distinction is at the heart of our decisions in both *Barraza Rivera* and *Ramos–Vasquez.*

of his claim ... and ... the IJ based her finding in part on an explicit rejection of the validity of his evidence"). Nevertheless, because we hold that the BIA's decision is not supported by substantial evidence and that Martirosyan is eligible for asylum and withholding of deportation, consideration of this issue is unnecessary.

## III.

For the foregoing reasons, Martirosyan's petition is granted. The INS's decision that he was ineligible for refugee status is not supported by substantial evidence. To the contrary, we find that Martirosyan presented compelling evidence that demonstrates a well-founded fear of persecution based on his conscientious objection to serving in the Armenian Army where he "would necessarily be required to engage in inhuman" treatment of prisoners of war. *Barraza Rivera*, 913 F.2d at 1451 (quoting *In re A–G–*, 19 I & N Dec. 3040). Accordingly, we remand to the BIA for further proceedings consistent with this opinion.

PETITION FOR REVIEW GRANTED. The decision of the BIA is VACATED and the case is REMANDED.

WALLACE, Circuit Judge, dissenting:

The majority opinion invites a stern rebuke from the Supreme Court by conflicting with controlling case law and for misapplying the proper standard of review. The majority orders asylum for a draft dodger who offered no evidence in support of his claim that he would have been forced to commit war crimes had he not fled Armenia. Accordingly, I must dissent.

### I

The majority's factual review is extensive. However, the only relevant question before us is whether Martirosyan proved he would have been forced to commit war crimes had he not evaded the draft in his home country. We should focus on the facts dealing with this issue.

As an officer in the Soviet army, Martirosyan was sent to Kazakhstan in 1988 to work as a "counselor." He described himself as the Soviet equivalent of an American Army's "chaplain" and testified that his job was to boost the morale of soldiers returning from the conflict in Afghanistan and to reindoctrinate those who had strayed from the ideals of Communism.

Despite his orders, Martirosyan felt that the best way to improve the morale of the troops returning from the front would have been to send them home to their families instead of isolating them for an additional six months. Martirosyan chose to send a letter outlining his feelings on the matter directly to the Soviet Deputy Defense Minister.

When the army learned of his action, it issued him a negative evaluation and transferred him to a different post. At this post, Martirosyan was not responsible for counseling soldiers returning from active combat, but rather for soldiers responsible for transporting arms that were being dismantled. Martirosyan saw the assignment of counseling soldiers "engaged in blue collar work" as "an exile." He continued to speak out, and within a year he was fired from the Army for "looseness in his ideological structure."

After spending a few years in Armenia employed by a private insurance company, Martirosyan was apparently drafted while working towards earning an MBA at the American University. The Armenian military commissariat for Martirosyan's region told him that he was to be sent to a prisoner of war camp to try to influence some of the prisoners to become double agents in Armenia's conflict with Azerbaijan.

Martirosyan had no interest in this posting. Although he was willing to serve as a soldier, Martirosyan did not want to work with prisoners of war. His pleas, however, fell on deaf ears: the military said his

assignment would not be discussed and he was going to the prisoner of war camp. The military wanted him for the post because of his past training and experience as a counselor.

Martirosyan responded by sneaking into Russia, where he lived and worked for several years. During this time, Martirosyan did not apply for asylum. It was only when Russia signed a pact with Armenia promising to return deserters and draft dodgers such as Martirosyan that he went back to Armenia, paid a government official $100 to get a passport, and fled to the United States rather than face seven years of jail time for draft dodging.

Once in the United States, Martirosyan claimed asylum on the basis of his "assumption" that, had he reported to the prisoner of war camp as ordered, he would have been forced to commit human rights violations.

II

The factual basis for Martirosyan's "assumption" is a mystery to me. The record upon which we make our review contains *no* reference to *any* Armenian or Soviet soldier *ever* being *forced* to commit a human rights violation. Martirosyan admitted that he was never asked to participate in any kind of torture or ill-treatment and at no time in his testimony did he even state that any soldier in his army had ever been forced to commit such illegal acts.

Martirosyan attempted to support his claim for asylum by submitting articles from Amnesty International and Human Rights Watch along with a State Department report on Armenia. Not one of these documents contains even a single allegation of soldiers being forced to commit an atrocity. The majority responds to this charge in footnote 5, but still does not quote even *one* statement reporting an Armenian or Soviet soldier ever being forced to commit a human rights violation. The majority quotes these documents without grasping that generalized human rights abuse is not the issue in this case. The issue is whether this particular coun-

selor, trained in the art of boosting morale and tasked with the job of recruiting double agents, would be *forced* to commit unspeakable war crimes *himself.* There is not one shred of record evidence to support such a claim, nor has the majority quoted any for our benefit. Indeed, when Martirosyan himself was asked by the IJ whether he could point to anything in this background material to support his claim that he would be forced to torture prisoners if sent to the camp, he replied, "No."

This court recently emphasized that reports such as those relied upon by the majority "cannot establish [a petitioner's] claim independently," *Zahedi v. INS,* 222 F.3d 1157, 1163 (9th Cir.2000), yet the only other evidence on which the majority rests its conclusion is the testimony of Martirosyan-testimony in which Martirosyan admitted that he had never been asked to torture and kill anyone and that his knowledge about *general* conditions in prisoner of war camps were based solely on rumor. Martirosyan did not even claim to know as a matter of rumor that soldiers were being forced to torture prisoners; he simply "felt that [he] might be ordered to mistreat [prisoners]." In order to reach its result, the majority has improperly given greater weight to background documents than such evidence should command.

At his hearing before the immigration judge (IJ), the burden was on Martirosyan to present "credible, direct, and *specific* evidence" that he was going to be forced to commit human rights violations. *Meza–Manay v. INS,* 139 F.3d 759, 763 (9th Cir.1998) (emphasis added, internal quotations omitted). The record makes it clear that Martirosyan so utterly failed to carry his burden that had this been a civil trial, summary judgment in favor of the INS would have been proper. For the majority to hold that the evidence in favor of Martirosyan was so overwhelming that it "compelled" reversing the Board of Immigration Appeals (Board) and ordering asylum shows a complete jettisoning of the standard of review set by the Supreme Court for asylum cases. We are supposed to be

"highly deferential" to the Board, *Lata v. INS*, 204 F.3d 1241, 1245 (9th Cir.2000), and reverse its decisions only when our review of the evidence convinces us that the Board's analysis was so wrong that it reached a conclusion wholly unsupported by logic: in other words, one that no reasonable factfinder could ever have reached. *Id.* at 1244.

To make matters worse, the Supreme Court has already made it perfectly clear that a desire to avoid military service, without more, is not a valid ground for asylum. *INS v. Elias–Zacarias*, 502 U.S. 478, 482, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). This circuit recognized this proposition before *Elias–Zacarias*, and has followed the precedent ever since. *See, e.g., Castillo v. INS*, 951 F.2d 1117, 1122 (9th Cir.1991); *Rodriguez–Rivera v. U.S. Dept. of Immigration and Naturalization*, 848 F.2d 998, 1005 (9th Cir.1988) (per curiam) ("Rodriguez–Rivera ignores ... that the government's effort to recruit him into the military does not constitute political persecution."); *Kaveh–Haghigy v. INS*, 783 F.2d 1321, 1323 (9th Cir.1986) (per curiam) ("Even petitioners admit that being drafted [into the] army does not amount to persecution.").

In spite of this unbroken line of precedent, which should control the outcome of this case, the majority feels it can go the opposite direction based on the pre-*Elias-Zacarias* case of *Barraza Rivera v. INS*, 913 F.2d 1443 (9th Cir.1990). In *Barraza Rivera*, the petitioner was *ordered* by a military officer, *under threat of death*, to participate in the paid killing of two men. In that case, "a Salvadoran military official gave Barraza a terrifying choice: to murder others, or to be murdered himself." *Id.* at 1453. To the extent *Barraza Rivera*

survives after *Elias–Zacarias*, it does not assist Martirosyan.[1]

To argue that Martirosyan's situation is even remotely analogous to the situation in *Barraza Rivera* strains credulity. Martirosyan was never ordered to hurt anyone, and he was certainly never threatened with harm if he refused. To the contrary, there is no doubt that Martirosyan was perfectly willing to kill people as a soldier. What he wanted to avoid was another unglamourous posting:

> Question: From what you've said, sir, you're perfectly happy to pick up a weapon [and] shoot people in a battle.... You're qualified to be [a] soldier and shoot people. But you didn't want to be [at] a prisoner of war camp and deal with them. Isn't that correct?

> Answer: Absolutely.

Martirosyan was not persecuted. He fled because he feared *prosecution* for draft dodging. To reverse the Board, I would need to engage in speculation. Reasoned judicial analysis leads me to conclude that I am not compelled to overturn the Board.

I would deny the petition.

---

**1.** The majority also cites *Ramos–Vasquez v. INS*, 57 F.3d 857 (9th Cir.1995), in its footnote 3 as additional support of its position. However, *Ramos–Vasquez* also does not aid Martirosyan since in it the petitioner deserted after refusing to obey a direct order to execute his friend. *Id.* at 860. Clearly, there is no such evidence in the record of this case.